TENNESSEE GAS PIPELINE COMPANY, A DIVISION OF TENNECO, INC., Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

No. 83–1925.

United States Court of Appeals, District of Columbia Circuit.

Argued March 8, 1984.

Decided June 1, 1984.

Kathleen T. Puckett, Houston, Tex., with whom Michael R. Waller, Houston, Tex., Terence J. Collins and Douglas L. Corbett,

Washington, D.C., were on the brief, for petitioner.

Arlene Pianko Groner, F.E.R.C., Washington, D.C., with whom Stephen A. Melton, Acting Gen. Counsel, Barbara J. Weller, Deputy Sol., and A. Karen Hill, F.E.R.C., Washington, D.C., were on the brief, for respondent. Joanne Leveque, F.E.R.C., Washington, D.C., also entered an appearance for respondent.

Before GINSBURG, BORK and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

In *Middle South Energy, Inc.*, 23 FERC (CCH) ¶ 61,277 (May 24, 1983) (hereafter, *Middle South* ), an adjudicatory proceeding under the Federal Power Act, 16 U.S.C. §§ 791a–825r (1982) (FPA), the Federal Energy Regulatory Commission (Commission or FERC) rendered a novel decision. Rejecting a longstanding position on which a Commission interpretative rule (18 C.F.R. § 2.4 (1983)) rested, FERC held it had authority to suspend initial rates filed under the FPA. FERC's *Middle South* adjudication is now pending our decision on judicial review.[1] On the day FERC released its revised FPA interpretation in the *Middle South* adjudication, the Commission also amended two interpretative rules. *See Interpretation of Authority to Suspend Initial Rate Schedules*, III FERC STATUTES & REGULATIONS (CCH) ¶ 30,456 (May 24, 1983) (final rules); 24 FERC (CCH) ¶ 61,205 (Aug. 1, 1983) (order denying rehearing). FERC conformed its FPA interpretative rule to its holding in *Middle South*. *See* 48 Fed.Reg. 24,361 (1983) (to be codified at 18 C.F.R. § 2.4). In addition, FERC made a corresponding change in the parallel Natural Gas Act, 15 U.S.C. §§ 717–717w (1982) (NGA), interpretative rule. *See* 48 Fed. Reg. 24,361 (1983) (to be codified at 18

C.F.R. § 2.52). This case, pursued by Tennessee Gas Pipeline Company (Tennessee), involves a challenge to the Commission's NGA interpretative rule change.

■ FERC presents a threshold objection to Tennessee's petition for review. The Commission states that its new NGA interpretative rule has "no definitive impact on the rights of anyone" and is therefore not an independently reviewable action. Brief for the Respondent Federal Energy Regulatory Commission at 15 n. 5 (FERC Brief).[2] We conclude that the alleged "hardship" imposed on Tennessee by FERC's action lacks the concrete quality and immediacy necessary to invoke judicial review of an agency's bare interpretative statement on the meaning of a statutory text. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Association, Inc. v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Gardner v. Toilet Goods Association, Inc.*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967); *see also South Carolina Electric & Gas Co. v. ICC*, 734 F.2d 1541 (D.C.Cir.1984); *Baltimore Gas & Electric Co. v. ICC*, 672 F.2d 146 (D.C.Cir.1982). We therefore dismiss Tennessee's petition for want of a question ripe for review.

We recognize, however, as does the Commission, FERC Brief at 15 n. 5, that the FPA and NGA are similarly designed statutes. A court determination in an FPA adjudication may bear significantly on the appropriate construction of the NGA. *See, e.g., Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 n. 7, 101 S.Ct. 2925, 2930 n. 7, 69 L.Ed.2d 856 (1981). Because Tennessee has an evident interest in the latter statute's construction and application, we will accept Tennessee's presentation in this case as the submission of an amicus curiae in our review of FERC's *Middle South* adjudication.

---

1. *Middle South* and the instant petition were consolidated for March 8, 1984, oral argument.

2. Section 19(b) of the NGA, 15 U.S.C. § 717r(b) (1982), provides for judicial review on the petition of any party "aggrieved by an order issued by the Commission."

■ Two, now black letter, criteria govern ripeness determinations: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. at 149, 87 S.Ct. at 1515; *see Air New Zealand, Ltd. v. CAB,* 726 F.2d 832, 835–37 (D.C.Cir.1984); *Arkansas Power & Light Co. v. ICC,* 725 F.2d 716, 724–26 (D.C.Cir.1984). Tennessee's petition does not focus on particular NGA applications; it addresses the agency's attempt to locate congressional intent with regard to the NGA's governance of initial rates generally, and thus meets the "fitness ... for judicial decision" criterion. *See Abbott Laboratories v. Gardner,* 387 U.S. at 149, 87 S.Ct. at 1515 (legal issues fit for review where "both sides have approached [the] case as one purely of congressional intent"); *Baltimore Gas & Electric Co. v. ICC,* 672 F.2d at 149 (same). But the "fitness" of an agency's interpretative ruling for abstract review, while a commonly-met factor when administrators state their advice on what a statute means, does not serve as the critical test in cases of this kind. Mindful of the Constitution's "case or controversy" limitation on our authority, *see Regional Rail Reorganization Act Cases,* 419 U.S. 102, 138, 95 S.Ct. 335, 355, 42 L.Ed.2d 320 (1974),[3] we must attentively inquire whether Tennessee has shown current "hardship" to its operations as a result of FERC's newly-made interpretation. *See South Carolina Electric & Gas Co., supra,* at 1544–1547.

Tennessee argues that the Commission's officially-announced view—that, under section 4 of the NGA, it can suspend initial rate schedules, set interim rates during the suspension period, and subject once-suspended or interim rates to contingent refund obligations—has a significant immediate impact on Tennessee's planning "because of the uncertainties which the new interpretation adds to the regulatory process in general and to the acceptability of certificates of public convenience and necessity issued to Tennessee, in particular."

Brief of Petitioner Tennessee Gas Pipeline Company at 13. Tennessee describes elaborately the uncertainties it urges in support of judicial review in advance of any Commission attempt to apply the new rule to Tennessee. *See id.* at 33–37; Reply Brief of Petitioner Tennessee Gas Pipeline Company at 3–10.

Prior to offering a new gas transmission service, a pipeline company is generally required to apply for a certificate of public convenience and necessity authorizing the new service. As Tennessee points out, under section 7(e) of the NGA, 15 U.S.C. § 717f(e) (1982), the Commission has discretionary authority to condition the grant of certificates on initial prices that are "in keeping with the public convenience and necessity." *Atlantic Refining Co. v. Public Service Commission,* 360 U.S. 378, 391, 79 S.Ct. 1246, 1255, 3 L.Ed.2d 1312 (1959). The typical price condition authorizes a particular initial rate and further provides that, if the authorized initial rate is ultimately found unreasonable, overcharges will be refunded. *See, e.g., Tennessee Gas Pipeline Co.,* 21 FERC (CCH) ¶ 61,199, at 61,456 (Nov. 26, 1982). Once a pipeline company accepts a certificate authorized by the Commission, it becomes obligated to provide the service and to do so under the conditions stated in the certificate.

Under this scheme, with section 7(e) as the sole provision in point, Tennessee can be secure in the initial price it charges. If it receives an unconditioned certificate, whatever initial rate Tennessee subsequently files with FERC will govern. If the certificate is conditioned, Tennessee will be positioned to accept or reject it in light of the price the Commission authorizes, and the pipeline company's known exposure to refund obligations.

FERC, in its new interpretation, maintains that, in addition to its section 7(e) authority to condition certificates, it has authority under section 4 to suspend initial rates. If FERC is correct, Tennessee urges, pipeline companies must factor a new risk into their decision whether to ac-

---

**3.** *See generally* G. GUNTHER, CASES AND MATERIALS ON CONSTITUTIONAL LAW 1655–66 (10th ed. 1980).

cept a certificate. Tennessee hypothesizes this series of events: it accepts a certificate and files an initial rate schedule; FERC, exercising its newly-asserted authority, both suspends the rate and requires the pipeline to charge a lower rate during the up to five month suspension period; the initially filed rate is ultimately found just and reasonable. If this series of events comes to pass, "Tennessee will be exposed to ... a nonrecoverable loss." Brief of Petitioner Tennessee Gas Pipeline Company at 35.[4] The risk of this potential loss, Tennessee asserts, impacts on its current planning and establishes the requisite "hardship."

There are many "ifs" in Tennessee's nonrecoverable loss scenario. The Commission will visit this potential loss upon Tennessee only if first, the Commission initially by-passes its section 7(e) certificate conditioning authority and then invokes, post-certificate, its recently claimed section 4 suspension power;[5] second, the Commission requires a lower rate to take effect during a suspension term that covers a significant period of the pipeline's operation; third, Tennessee eventually proves the initial rate just and reasonable. Nothing Tennessee presents suggests that the series of events it hypothesizes as exposing it to a sizable potential loss is sufficiently probable to affect investment decisions, and thereby to harm Tennessee "in a concrete way." *Abbott Laboratories*, 387 U.S. at 148, 87 S.Ct. at 1515.

On the contrary, FERC has stated repeatedly in these proceedings that it anticipates invocation of its interpretative rule in the natural gas area "only infrequently" because section 7(e) arms it with "sufficient authority to protect the public interest in most situations." FERC Supplemental Memorandum at 1.[6] The Commission noted, specifically, that in the ten months since it issued the NGA interpretative rule, it "has confined exercise of [the newly-asserted] suspension authority to situations arising under a new regulatory program that the Commission adopted without reserving its usual section 7(e) authority to ensure that initial rates are in the public convenience and necessity." *Id.* at 2. Tennessee asserts no current or even projected involvement in the "new regulatory program" FERC described.[7]

In addition to the "iffiness" of the loss scenario Tennessee asserts as an inhibition to capital investment,[8] another factor con-

---

**4.** A pipeline company cannot recover revenue forgone during a suspension period even if the suspended rate is later found to be just and reasonable. *See FPC v. Tennessee Gas Co.*, 371 U.S. 145, 152, 83 S.Ct. 211, 215, 9 L.Ed.2d 199 (1962); *Belco Petroleum Corp. v. FERC*, 589 F.2d 680, 682 (D.C.Cir.1978).

**5.** Tennessee could suffer the same loss if the Commission, having included a rate condition in the certificate, subsequently chose to suspend the initial rate authorized therein. The prospect that FERC would suspend a rate it had approved during the licensing process, however, appears remote.

**6.** The Commission's order adopting the final rule addressed the matter in a footnote:

The Commission expects the suspension of initial rates under the NGA will not frequently occur because of the Commission's certificate authority under section 7(e) of the NGA. Under section 7(e), the Commission may condition a certificate with an adjustment to the proposed initial rate to ensure that service is initiated under rates consistent with the public interest. Refunds of amounts collected under temporary certificates may also be conditions of permanent certification.
III FERC Statutes & Regulations at 30,553 n. 2; *see also* 24 FERC (CCH) at 61,489 (order denying rehearing) (in view of "authority to condition the grant of certificates under section 7(e) of the NGA," Commission anticipates "infrequent need" to suspend initial rates "in the natural gas area").

**7.** Moreover, the Commission's stated policy is that "[a] shortened suspension period is warranted" for rates filed under this program. ANR Pipeline Co., 26 FERC (CCH) ¶ 61,170, at 61,420 (Feb. 10, 1984) (one-month suspension); *see* Columbia Gas Transmission Co., 25 FERC (CCH) ¶ 61,652 (Nov. 18, 1983) (one-day suspension). A nonrecoverable loss of significant size is therefore unlikely under the program.

**8.** *Cf. Air New Zealand, Ltd. v. CAB*, 726 F.2d at 837–38 (case not ripe for review where realization of alleged risk created by agency order appeared too improbable to deter primary conduct); *South Carolina Electric & Gas Co. v. ICC*, *supra*, at 1546 (case not ripe for review where it is "highly implausible that the existence of [the

tributes to our assurance that this case is not ripe for review. Should FERC in fact invoke section 4 to suspend one of Tennessee's initial rates, Tennessee would have immediate recourse to the judiciary to contest FERC's statutory authority. The Supreme Court so indicated in *Trans Alaska Pipeline Rate Cases (TAPS)*, 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978). The High Court there reviewed an order suspending an initial rate to determine whether Congress had authorized the agency's action. The Court stated explicitly: "[C]ourts have jurisdiction to review suspension orders to the limited extent necessary to ensure that such orders do not overstep the bounds of Commission authority." *Id.* at 638 n. 17, 98 S.Ct. at 2058 n. 17.[9] While the Court's reference in *TAPS* was to the Interstate Commerce Commission (ICC), it is solidly established that the review criteria applicable to ICC suspension orders apply as well to rate suspensions ordered by FERC. *See Exxon Pipeline Co. v. FERC*, 725 F.2d 1467, 1470–73 & n. 9 (D.C.Cir.1984); *Papago Tribal Utility Authority v. FERC*, 628 F.2d 235, 242–43 & n. 19 (D.C.Cir.), *cert. denied*, 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980); *Municipal Light Boards v. FPC*, 450 F.2d 1341, 1349–52 (D.C.Cir.1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972).

In sum, the application of FERC's NGA interpretative rule to Tennessee remains hypothetical. If the Commission in fact invokes the rule against Tennessee, that action will be subject to judicial review in time to block "nonrecoverable loss" to Tennessee. The planning insecurity Tennessee advances does not set its case apart from the mine run of situations in which an enterprise confronts official interpretations and policy statements regarding projected application of regulatory or fiscal legislation. Were we to entertain anticipatory challenges pressed by parties facing no imminent threat of adverse agency action, no hard choice between compliance certain to be disadvantageous and a high probability of strong sanctions, *see Arkansas Power & Light Co. v. ICC*, 725 F.2d at 726, we would venture away from the domain of judicial review into a realm more accurately described as judicial preview. No roving preview function has been assigned to courts in the federal system. *See South Carolina Electric & Gas Co. v. ICC, supra*, at 1546–1547.

For the reasons stated, we dismiss Tennessee's petition for review of FERC's revised NGA interpretative ruling, but accept Tennessee's submission as an amicus curiae presentation in the review, currently pending, of the Commission's *Middle South* adjudication.

adopted] rule will affect petitioners' conduct in [contract] negotiations" with the rule's target).

9. The court can maintain the status quo during the period of review by staying the suspension order on the condition that the monies collected by the pipeline company remain subject to refund. *See, e.g., Mobil Alaska Pipeline Co. v. United States*, 434 U.S. 949, 98 S.Ct. 475, 54 L.Ed.2d 309 (1977).