**MIDDLE SOUTH ENERGY, INC., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

Arkansas Public Service Commission, Cities of Conway and West Memphis, Arkansas, Cities of Benton, et al., City of New Orleans, Louisiana, Louisiana Public Service Commission, Mississippi Public Service Commission, International Paper Company, Intervenors.

**MIDDLE SOUTH ENERGY, INC., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

Tennessee Gas Pipeline Company, Cities of Conway and West Memphis, Arkansas, International Paper Company, Intervenors.

**MIDDLE SOUTH ENERGY, INC., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

Arkansas Public Service Commission, Cities of Conway and West Memphis, Arkansas, Occidental Chemical Corporation, Louisiana Public Service Commission, International Paper Company, Intervenors.

**MIDDLE SOUTH ENERGY, INC., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

Louisiana Public Service Commission, International Paper Company, Intervenors.

Nos. 83–1632, 83–1772, 83–1810 and 83–1811.

United States Court of Appeals, District of Columbia Circuit.

Argued March 8, 1984.

Decided Nov. 6, 1984.

Ginsburg, Circuit Judge, dissented in part with opinion.

Richard M. Merriman, Washington, D.C., with whom Floyd L. Norton, IV, and Stephen L. Huntoon, Washington, D.C., were on the brief, for petitioner.

Arlene Pianko Groner, Atty., F.E.R.C., Washington, D.C., with whom Stephen A. Melton, Acting Gen. Counsel, Barbara J. Weller, Deputy Sol. and A. Karen Hill, Attorney, F.E.R.C., Washington, D.C., were on the brief, for respondent, Joanne Leveque, Attorney, F.E.R.C., Washington, D.C., also entered an appearance for respondent.

Glen L. Ortman, Washington, D.C., with whom Clinton A. Vince, Gregg D. Ottinger and Paul E. Nordstrom, Washington, D.C., were on the brief, for City of New Orleans, Louisiana, intervenor in No. 83–1632.

Michael R. Fontham and William E. Brown, New Orleans, La., were on the brief for Louisiana Public Service Com'n, intervenor in Nos. 83–1632, 83–1810 and 83–1811.

William F. Cockrell, Jr., Washington, D.C., and Hiram C. Eastland, Jackson, Miss., were on the brief for Mississippi Public Service Com'n, intervenor in No. 83–1632.

Earle H. O'Donnell, Washington, D.C., was on the brief for Occidental Chemical Corp., intervenor in No. 83–1810.

Charles F. Wheatley, Jr. and Don Charles Uthus, Washington, D.C., entered appearances for Cities of Conway and West Memphis, Arkansas, intervenor in Nos. 83–1632, 83–1772 and 83–1810.

Terence J. Collins, Houston, Tex., entered an appearance for Tennessee Gas Pipeline Co., intervenor in No. 83–1772.

James D. Pembroke, Washington, D.C., entered an appearance for Arkansas Public Service Com'n, intervenor in Nos. 83–1632 and 83–1810.

Rigdon H. Boykin, New York City, entered an appearance for Intern. Paper Co., intervenor in Nos. 83–1632, 83–1772, 83–1810 and 83–1811.

Zachary D. Wilson, North Little Rock, Ark., entered an appearance for Cities of Benton, et al., intervenors in No. 83–1632.

Before GINSBURG, BORK, and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

Opinion concurring in part and dissenting in part filed by Circuit Judge Ginsburg.

BORK, Circuit Judge:

Middle South Energy, Inc. appeals the Federal Energy Regulatory Commission's orders suspending Middle South Energy's initial rate schedule for the sale of electricity. Middle South also appeals the Commission's orders announcing that the Commission now interprets its suspension authority under the Federal Power Act and the Natural Gas Act to include authority to suspend initial rates. Petitioner alleges that the statutory language, legislative history, previous Commission interpretation and judicial assumptions all weigh strongly against FERC's new view that it has the authority to suspend initial rate filings. FERC, on the other hand, maintains that the recent Supreme Court decision in *Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978), construing parallel rate provisions in the Interstate Commerce Act, shows that the Commission's previous interpretation of its authority was unduly limited. Our analysis compels the conclusion that FERC lacks the authority to suspend initial rate filings.

## I.

### A.

The Federal Energy Regulatory Commission regulates rates for wholesale interstate sales of electricity pursuant to sections 205 and 206 of the Federal Power Act, 16 U.S.C. §§ 824d and 824e (1982). Section 205(a) stipulates that all rates for jurisdictional sales of electricity shall be reasonable and just. Section 205(b) prohibits undue preferences and discrimination among customers. Section 205(c) mandates the filing of all rate schedules with the Commission. Section 205(d) requires that a utility give sixty days' notice to the Commission and the public by filing the changed schedule. The provision at issue here is section 205(e). It states that "[w]henever any such new schedule is filed," the Commission may set the proposal for hearing, may suspend the rates for up to five months, and may require refunds of any rates collected thereafter that the Commission ultimately finds unjust and unreasonable. Finally, according to section 206, the Commission may, *sua sponte*, investigate any jurisdictional rate that is in effect and, if it finds the rate unjust and unreasonable, establish a new rate for prospective effect only.

Traditionally, the Commission has interpreted its authority to suspend rates and require refunds under section 205(e) as limited to *changes* in rates filed under section 205(d). In 1978 the Supreme Court held

that parallel rate provisions in the Interstate Commerce Act ("ICA") authorized the Interstate Commerce Commission to suspend rates and require refunds of initial rates filed by oil pipelines. *See Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978). In the course of adjudicating the present controversy, the Commission has decided that its previous interpretation of its authority under section 205(e) is wrong, and it now claims suspension and refund powers over initial as well as changed rates.

### B.

Middle South Utilities, Inc. is a registered public utility holding company consisting of four operating companies: Arkansas Power & Light Company, Louisiana Power & Light Company, Mississippi Power & Light Company, and New Orleans Public Service, Inc. In 1974, Middle South Utilities created a wholly owned subsidiary, Middle South Energy, Inc. ("MSE"), to develop the Grand Gulf Nuclear Electric Station Project. On June 18, 1982, MSE submitted a rate schedule for filing to FERC. It described this as an initial rate schedule. The Commission accepted this rate schedule for filing but decided that the submission should be treated as a change in rate rather than an initial rate filing. The Commission found:

> Although MSE has been interposed as a separate company, the transaction is wholly intra-corporate in nature with MSE acting for the sole purpose of operating a facility which would otherwise be controlled, like other system resources, by another MSU operating company; the total output of the facility available to MSE will, in turn, be sold to MSU subsidiaries.

Record on appeal ("R.") at 42. For these reasons, the Commission decided to construe MSE's rate filing "as a joint corporate submittal modifying or affecting the existing coordination arrangements among the MSU affiliates." *Id.* With respect to the substance of the rate schedule, the Commission found that the rates may be "unjust, unreasonable, unduly discriminatory or preferential, or otherwise unlawful." *Id.* The Commission therefore suspended the operation of the proposed agreement. It authorized the agreement to take effect subject to refund when service began. The Commission further ordered that a public hearing be held on the subject of the justness and reasonableness of MSE's rates, pursuant to section 205 of the FPA. R. at 43.

MSE then sought rehearing of FERC's order on the ground that the agreement should be treated as an initial rate filing rather than a change in rate. After granting rehearing on May 24, 1983, the Commission concluded: "it is not appropriate to treat an initial rate of a new corporate entity as a change in rate simply because of its affiliated status." R. at 91. Nevertheless, the Commission stated that "the order of August 25, 1982, would remain unchanged with respect to MSE's rates." *Id.* at 98. As the new basis for its order the Commission presented its conclusion that, contrary to its previous interpretation, it did have authority under section 205 of the FPA to suspend initial rates. *Id.*

MSE petitioned for rehearing of this order on two grounds: (1) that the Commission lacked the authority to suspend or order refunds of initial rates, R. at 99–133; (2) that even if the Commission's interpretation of its authority were correct, it had violated its own rules and the Administrative Procedure Act by exercising that authority in MSE's case. *Id.* at 133–46. In denying rehearing on August 1, 1983, the Commission relied on the Supreme Court's analysis of the ICA in the *Trans Alaska Pipeline Rate Cases*. Regarding MSE's procedural allegations, the Commission stated that formal rulemaking is not required to effect a change in the Commission's interpretation of its own statutory authority.

On the same day that it issued the order on rehearing in the Middle South rate case, the Commission issued Order No. 303, amending the interpretation of its suspension authority set forth in its regulations

under the FPA and under the parallel Natural Gas Act, 15 U.S.C. §§ 717–717w (1982). 18 C.F.R. §§ 2.4(d), 2.52 (1983). R. at 161–77. The Commission stated that it was amending its published interpretations to reflect its new construction of its authority to suspend initial rate schedules, establish interim rates during the suspension period, and establish contingent refund obligations under both the Natural Gas Act and the Federal Power Act. R. at 162. MSE filed for rehearing of the new interpretive rule under the FPA, and Tennessee Gas Pipeline Company filed for rehearing of the new interpretive rule under the Natural Gas Act.[1] *Id.* at 194–239, 181–93. On August 1, 1983, the Commission denied rehearing. In this court, Middle South seeks review both of the Commission's order suspending its rates and of the Commission's new interpretive rule.

## II.

The Commission asserts that the Supreme Court decision in *Trans Alaska Pipeline Rate Cases* ("*TAPS*"), 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978), justifies it in exercising the power to suspend initial rates. In *TAPS*, the Supreme Court held that section 15(7) of the ICA authorized the ICC to suspend initial tariff schedules. Section 15(7) of the ICA, 49 U.S.C. § 15(7) (1976), states:

> Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, ... the Commission shall have ... authority ... to enter upon a hearing concerning the lawfulness of such rate, ... and pending such hearing and the decision thereon the Commission, ... may from time to time suspend the operation of such schedule and defer the use of such rate .... If the proceeding has not been concluded and an order made within the period of

> suspension, the proposed change of rate ... shall go into effect at the end of such period; but in case of a proposed increased rate ..., the Commission may by order require ... refund, with interest ... of such increased rates or charges as by its decision shall be found not justified ....

In reaching its holding in *TAPS*, the Supreme Court emphasized the language of section 15(7), in particular, the phrase, "*any* schedule stating a *new* individual or joint rate." 436 U.S. at 642, 98 S.Ct. at 2060 (emphasis added). The Court rejected the argument that "new," as used in section 15(7) of the ICA, refers only to changed or increased rates. The Court reasoned that the literal language of the statute, which embraces "*any* schedule stating a new ... rate," presumptively included initial rates: "[i]t is hard to imagine rates any more "new" than those filed for TAPS, a service which has never before been offered." 436 U.S. at 642, 98 S.Ct. at 2060. Thus, the burden was on the petitioning utilities to show that " 'new' does not really mean 'new,' but refers only to increased or changed rates ...." *Id.*

The Court recognized that it had some leeway in interpreting the words of a statute to avoid results that would frustrate the purpose of the statute, 436 U.S. at 643, 98 S.Ct. at 2061, which, as the Court had earlier noted, was to ensure that charges for transportation should be reasonable and just. *See id.* at 639, 98 S.Ct. at 2059. However, the Court concluded that to read "any schedule stating a new ... rate" as including only changed rates would impair the statutory purpose rather than promoting it: "a literal reading of the word 'new' in § 15(7) is necessary to curb mischief flowing from unchecked initial rates, which is in every way identical to that

---

**1.** Tennessee Gas also petitioned for review of the Commission's new interpretive rule construing its suspension power under the Natural Gas Act. In *Tennessee Gas Pipeline Co. v. FERC,* 736 F.2d 747 (D.C.Cir.1984), this panel dismissed Tennessee's petition because the application of the Commission's NGA interpretive rule re-

mained hypothetical as to Tennessee Gas, and hence was nonreviewable. However, in view of the similarity between the pertinent provisions of the FPA and the NGA, we stated that we would accept Tennessee's presentation as "the submission of an amicus curiae in our review of FERC's *Middle South* adjudication." *Id.* at 748.

flowing from unchecked changes in rates ...." *Id.* at 631, 98 S.Ct. at 2053.

■ The equivalence of harms the *TAPS* Court posited is simply that an unreasonable initial rate is just as harmful as an unreasonable changed rate. But that was not the sole basis for this portion of the Court's analysis. The ICC's power to set reasonable rates is prospective—it applies only after a rate becomes effective. 436 U.S. at 640, 98 S.Ct. at 2059. Consequently, absent suspension power over initial rates, the only check on the harmful effects those rates, if unreasonable, would have prior to prospective ICC rate-making would be the reparations remedy. *See id.* But the reparations remedy, as Congress itself had determined when it gave the ICC suspension powers in 1910, was ineffective because it was a form of *private* enforcement. *See id.* Reparations would be ordered only if injured shippers complained to the ICC, and all too often shippers would not complain because they could pass the unreasonable rates on to consumers. *Id.* Moreover, "in the absence of suspension authority, unreasonable initial rates—both generally and in these cases—like unreasonable increases in existing rates, will almost certainly be passed along to 'a prior producer or ... to the ultimate consumer.'" *Id.* at 644, 98 S.Ct. at 2061 (citation omitted). Thus, even if the shipper sought reparations the harm to consumers would go unremedied. It was recognition of precisely this problem that had prompted Congress to enact the Mann-Elkins Act, which first gave suspension powers to the ICC.

Having determined that both the literal meaning and the history of Congress' efforts to achieve its central statutory purpose supported reading section 15(7) of the ICA as conferring suspension power over initial rates, the *TAPS* Court was prepared to reach a contrary result only if "unequivocal statements in the legislative history of the Act would support any limitation on the suspension power." 436 U.S. at 645, 98 S.Ct. at 2062. Finding that there were no such unequivocal statements, the Court held that the ICC has power to suspend initial rates. *Id.* at 646, 98 S.Ct. at 2062.

The *TAPS* decision, then, rests on two principal grounds: first, the literal meaning of the words of the statute. Second, the risk that a non-literal reading would lead to the kind of harm that Congress had concluded, based on experience with the regulation of transportation, could not effectively be prevented except through the suspension power. Only the second of these grounds is present in this case, and then only in an attenuated fashion.

■ We find respondent's argument that the decision in *TAPS* is controlling here unpersuasive, *ab initio*, because whereas the relevant language in the ICA reads simply "any schedule stating a new ... rate," the parallel language in the Federal Power Act reads "any *such* new schedule." [2] 16 U.S.C. § 824d(e) (1982) (emphasis added). Prima facie, the use of the iterative adjective "such" indicates that this language is understandable only by reference to the sole prior reference in section 205 to "new schedule:" this reference is contained in section 205(d), which immediately precedes section 205(e) and which, it is undisputed, applies only to changed rates. Section 205(d), which re-

---

2. The Commission argues that the Supreme Court's conclusion in *TAPS* about the Interstate Commerce Act applies equally to the Federal Power Act. According to FERC, in 1935 Congress deliberately modeled the FPA on the ICA. *See* Brief for the Respondent FERC at 20. Not only does the legislative history substantiate this derivation, in FERC's view, the language employed in § 205 of the FPA parallels that used in §§ 1, 6 and 15(7) of the ICA, 49 U.S.C. §§ 1, 6 and 15(7) (1976). Respondent goes on to note that the courts have consistently interpreted the FPA on the basis of the ICA. Brief for the

Respondent FERC at 20–21. *See, e.g., Papago Tribal Utility Authority v. FERC,* 628 F.2d 235, 241–43 & n. 19 (D.C.Cir.1980); *Municipal Light Boards v. FPC,* 450 F.2d 1341, 1349 (D.C.Cir. 1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972). While we agree that the FPA was modeled on the ICA, we find the Commission's argument both overbroad and circular: we cannot discharge our duty to construe the FPA in accordance with Congressional intent by presupposing that the FPA is identical with the ICA. Modeling is not cloning.

quires notice to the Commission before rate changes go into effect, talks about "new schedules stating plainly the change or changes to be made in the schedule or schedules then in force." The straightforward conclusion is that the phrase "such new schedules" in section 205(e) refers only to the schedules in section 205(d).

In its May 24, 1983 order the Commission ruled that "such new schedule" refers back to section 205(c), which does not employ the expression "new schedules," but instead speaks of "all rates and charges." The Commission argues, and Judge Ginsburg agrees, that "such new schedules" can be read as referring back to "all rates and charges," with the intended meaning being that existing rates cannot be suspended, but new rates—changed or initial—can. While this reading is not impossible, we think it is strained. It asks us to conclude that when Congress used "new schedules" in section 205(d) it meant schedules filed pursuant to a change in rates, but that when, immediately afterwards, it referred to "any such new schedule" it meant to give a different and broader meaning to the word "new". Moreover, the use of "such" is puzzling on this reading; had Congress simply said "any new schedule" the Commission's reading would be more plausible. The only reading that gives effect to each of the words Congress employed in section 205(e) is that the suspension power applies only to changed rates.

This interpretation is also supported by some language used later in section 205(e): "If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate ... shall go into effect at the end of such period ...." As the petitioner points out, if "change" is used here in its common-sense meaning, then initial rate schedules are excluded.

▮ In addition to the plain language of the statute, the most nearly contemporaneous construction of section 205 by the Commission—and the Commission drafted the statute—corroborates the Commission's lack of authority to suspend initial rates. Courts regard with particular respect the contemporaneous construction of a statute by those initially charged with its enforcement. *See, e.g., TAPS*, 436 U.S. at 648 n. 26, 98 S.Ct. at 2063 n. 26; *Chemehueir Tribe of Indians v. FPC*, 420 U.S. 395, 409–10, 95 S.Ct. 1066, 1075–76, 43 L.Ed.2d 279 (1975). Here, where the agency was involved in developing the provisions, this principle applies with even greater force. *See Miller v. Youakim*, 440 U.S. 125, 144, 99 S.Ct. 957, 968, 59 L.Ed.2d 194 (1979). It is therefore highly significant that on May 29, 1945, in its first comprehensive discussion of the suspension power, the Federal Power Commission approved and adopted, *inter alia*, the following interpretation of its powers under section 205 of the Federal Power Act and section 4 of the Natural Gas Act: "An initial rate cannot be suspended." 18 C.F.R. §§ 2.4, 2.52 (1983).[3] While this interpretation is not, strictly speaking, contemporaneous, the Commission concedes that it has steadfastly adhered to this reading of its suspension powers since 1945, and has not asserted that a different understanding informed its administration of the statute prior to that time. We assign considerable importance to this longstanding interpretation of the statute in accordance with its literal language.[4]

---

**3.** Of the five commissioners present at the May 29, 1945 meeting, two had begun to serve on the Commission before Congress passed the Federal Power Act in 1935. A third commissioner had begun his tenure on the Commission after the Federal Power Act was passed but before the Natural Gas Act was passed in 1938.

**4.** Not only has the FPC denied it had the power to suspend initial rates over a forty-five year period; the courts, too, have invariably held the same view. *Indiana & Michigan Municipal Dis-*

*tributors v. FERC*, 659 F.2d 1193, 1196 (D.C.Cir. 1981); *Florida Power & Light Co. v. FERC*, 617 F.2d 809, 812 n. 2 (D.C.Cir.1980); *Otter Tail Power Co. v. FERC*, 583 F.2d 399, 405–06 (8th Cir.1978), *cert. denied*, 440 U.S. 950, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979); *Sun Oil Co. v. FPC*, 281 F.2d 275, 277–78 (5th Cir.1960); *Phillips Petroleum Co. v. FPC*, 258 F.2d 906, 917–18 (10th Cir.1958). No court has held to the contrary. We recognize that none of these cases considers the relevance of the Supreme Court's decision in

Besides the plain language of the statute and forty-five years of interpretation by the Commission and the courts, some additional support for petitioner's view of FERC's power to suspend initial rates comes from the legislative history of the Act. The FPC's analysis of the legislation it wrote, which it submitted to the House and Senate committees, and which, after some revisions irrelevant here, became the FPA, states:

> [The precursor to section 205] requires each public utility to file with the Commission schedules showing the rates, charges, and classifications which are subject to Commission regulation in force and effect, and *no charge [sic] can be made therein* except after 30 days' notice to the Commission and to the public. The Commission is given authority, either upon complaint or upon its own initiative without complaint, *to suspend the effective date of the change in rates* for a period not exceeding 5 months beyond the time when the change would otherwise go into effect, for the purpose of investigating *the reasonableness of charge*. If the investigation cannot be completed with [sic] the 5 months' period, the new rate may go into effect, *but in case the change results in an increase in rates the Commission may require the utility to make refunds if the increase is not approved.*

*Public Utility Holding Companies: Hearings on H.R. 5423 Before the House Comm. on Interstate and Foreign Commerce*, 74th Cong., 1st Sess. 33–34 (1935) (emphasis added); *Public Utility Holding Company Act of 1935: Hearings on S.1725 Before the Senate Comm. on Interstate Commerce*, 74th Cong., 1st Sess. 41–42 (1935) (emphasis added). This authoritative summary conspicuously omits any mention of a suspension power over initial rates, although it notes that all rates, including initial rates, must be filed with the Commission. This legislative history confirms that section 205 does not give the Commission power to suspend initial rate filings.

■ The literal language of section 205 strongly suggests that the Commission has no power to suspend initial rates. The legislative history, though not conclusive, is to the same effect. The Commission, which drafted the statute, early interpreted section 205 in this way, and adhered to that interpretation for almost forty years. Together, these considerations make this case wholly distinguishable from *TAPS*. The only feature this case shares with *TAPS* is that the absence of suspension power creates a gap in the agency's ability to ensure that initial rates conform, in all cases and at all times, to the statutory command that rates be just and reasonable. The Commission urges us to give dispositive weight to this consideration. We decline to do so, because we are completely unpersuaded that the *TAPS* Court's discussion of the parallel statutory command of the ICA can be read so sweepingly. We cannot legislate to remedy the gap, however troublesome, that the language, legislative history, and the Commission's longstanding interpretation establish as a part of the statutory scheme enacted by Congress. Nor do we think the *TAPS* Court was moved primarily by the desirability of filling the gap.

As earlier mentioned, the *TAPS* Court emphasized that *Congress* had decided that experience with the ICA demonstrated the necessity of suspension powers in order to remedy the perceived deficiency of the reparations remedy. The reparations remedy was equally available, and viewed as equally ineffective, whether the rates were initial or changed. Accordingly, the Court inferred that Congress must have intended to extend the suspension power to embrace initial as well as changed rates, and it

---

*TAPS*, but our own analysis of that decision shows that it is not controlling here. We join in the assessment of § 205 offered by Judge Lumbard in *Florida Power & Light Co.*, 617 F.2d at 812 n. 2: "[a]s a matter of commonsensical construction, 'any such new schedule' in § 205(e) refers to the immediately preceding 'new schedules' in § 205(d) rather than to the more general and more distant 'schedules' in § 205(c)."

relied on this inference to buttress its reading of the statute's literal language.

Thus, the *TAPS* Court did not engage in legislative gap-filling. Rather, the Court drew an inference, supported by the legislative history and by the statute's literal language, from Congress' general intent to its likely intent as to a specific aspect of the ICA. Here, where in contrast the legislative history, the literal language, and the Commission's established interpretation all point to a *limitation* on Congress' "general intent" to ensure that all rates be just and reasonable, that inference is highly implausible. Were we convinced that catastrophe would ensue, we might nonetheless be forced to decide that the relief the Commission requests is for Congress, not this court, to grant. But we cannot agree that catastrophe will ensue.

The Commission's concern is that "the Commission cannot remedy an illegal initial rate until it can complete a full ratemaking hearing under section 206, and then only prospectively." Consequently, the Commission fears that utilities will be able to charge unreasonable initial rates with impunity, and will retain the unlawful proceeds even after the Commission has ordered them to cease charging the unlawful rate. Brief for Respondent FERC at 26. We recognize that this possibility exists, and that it is somewhat aggravated by the fact that, unlike the ICC, the Commission cannot order reparations to ratepayers. *See City of Newark v. Delmarva Power & Light Co.*, 467 F.Supp. 763, 770, 771 (D.Del. 1979); *Carolina Power & Light Co.*, 52 F.P.C. 991, 992 (1974). However, the Commission has not claimed that ease of entry into the markets it regulates—either of buyers or sellers—makes this risk significant, as compared to the vast sectors of those markets in which initial rates were long since established. This omission suggests to us that the "gap" in the Commission's powers is smaller in fact than it

appears in argument. Moreover, the Commission has until now taken quite a broad view of its powers to characterize rates that are arguably initial as changed, where, as here, "the rates essentially allocated the output of a new generating unit among the existing jurisdictional companies that together own the facility ...." Brief for Respondent FERC at 6. This court has upheld the Commission's broad view of what constitutes a changed rate, stating that "[t]his is precisely the type of question we must leave to the technical expertise of the Commission; we will not substitute our judgment unless the Commission's judgment is unreasonable and cannot be rationally reconciled with the terms of the Act." *Florida Power & Light Co. v. FERC*, 617 F.2d 809, 815 (D.C.Cir.1980). Again, this suggests that many incremental changes in the types of services utilities offer their established customers will fall within the ambit of the Commission's suspension and refund powers. Then, too, the Commission's ability to grant prospective relief against unreasonable initial rates constrains the duration over which they will remain unreasonable, though it does not eliminate them altogether. Finally, even in those instances where a rate schedule is incontrovertibly new and therefore outside the Commission's suspension powers, we note that market forces continue to provide some constraints on the extent to which those rates will be unjust or unreasonable. Congress, of course, plainly determined that market constraints were insufficient in both the cases of initial and changed rates. But we see nothing absurd about a congressional determination that these constraints were not *equally* insufficient in the cases of initial and changed rates, or a policy decision that the risk that new services would not be offered outweighed the harm that this partial curtailment of the suspension power would allow.[5] These

---

5. We do not pretend to know that these reasons actually motivated Congress. As this court noted in *Indiana & Michigan Municipal Distributors Association v. FERC*, 659 F.2d 1193, 1196 n. 10 (D.C.Cir.1981), "[t]he legislative history surrounding the Federal Power Act of 1935 (S.2796) gives no illumination of why Congress chose to limit the Commission's retroactive-rate-making powers." Still, the plausibility of these

considerations persuade us that the "gap" the Commission asks us to rectify falls far short of being an "absurd result" that would support our straining the statute's language to find its sense.

For the foregoing reasons, we hold that section 205 does not give the Commission power to suspend initial rates. However, in view of the fact that the Commission initially viewed petitioner's filings as changed rates, we believe the Commission should be permitted to reconsider its later determination that petitioner's filings are initial rates. We therefore vacate the Commission's orders in Nos. 83–1810 and 83–1632 suspending petitioner's initial rates, and remand for renewed consideration of the propriety of characterizing Middle South's filings as changed rather than initial rates. A new characterization would, of course, be subject to review.

### III.

We now turn to the other issues raised by petitioner. First, petitioner claims that even if the Commission has power to suspend initial rates, it has no power, under section 205(e) of the Act or otherwise, to impose refund obligations on initial rates. However, because we hold that the Commission has no power to suspend initial rates, we need not decide whether, if it had that power, it could invoke an ancillary power to impose refund requirements.[6]

Petitioner also asks us to apply our holding that the Commission has no suspension power over initial rates, not only to the Commission's order suspending petitioner's initial rate filings, but also to the Commission's Order No. 303, *Interpretation of Authority to Suspend Initial Rate Schedules*, which reversed the Commission's longstanding regulation, 18 C.F.R. § 2.4(d)

(1983), and provided for suspension of initial rate schedules. The Commission argues that Order No. 303 is a nonreviewable interpretive rule, and that as such we have no jurisdiction to apply our holding to that rule. Because the legal effect of our holding is determined by whether or not we have jurisdiction to review Order No. 303, we are required to reach this jurisdictional issue.

We accept the Commission's characterization of Order No. 303 as an interpretive rule that, of its own force, creates no law and binds neither the public, the agency, nor the courts. *See Batterton v. Francis*, 432 U.S. 416, 425 & n. 9, 97 S.Ct. 2399, 2405 & n. 9, 53 L.Ed.2d 448 (1977). It follows that if Order No. 303 had never been applied in a particular case it would be unreviewable. *National Association of Insurance Agents v. Board of Governors*, 489 F.2d 1268, 1271 (D.C.Cir.1974). Here, however, Order No. 303 plainly *has* been applied to petitioner. The order, in pertinent part, is simply a declaration by the agency that it reads the FPA as granting it the power to suspend initial rates. This statutory authority, and no other, underlies the Commission's suspension of petitioner's initial filings. Consequently, Order No. 303 became reviewable when applied to petitioner, and our holding that the Commission has no power to suspend initial rates necessarily means that Order No. 303 is an incorrect reading of the FPA.[7]

Finally, petitioner maintains that the Commission acted *ultra vires* when it applied its new interpretation of its suspension powers to MSE. Petitioner maintains that the Commission must adhere to the rulemaking requirements of the APA "when it conclusively affects and substantially impacts preexisting rights with a ret-

---

and other reasons dispels the notion that the statute's literal language is palpably defective.

6. We note, however, that in *TAPS* the Supreme Court upheld the Interstate Commerce Commission's ancillary power to impose a refund obligation. 436 U.S. at 654–57, 98 S.Ct. at 2066–68.

7. We emphasize that our holding today is confined to that portion of Order No. 303 that

interprets the FPA. We express no opinion as to that portion of Order No. 303 which interprets the Commission's suspension power under the Natural Gas Act, because the Commission's NGA interpretative rule was not applied to Middle South. *See Tennessee Gas Pipeline Co. v. FERC*, 736 F.2d 747 (D.C.Cir.1984).

roactive rule that has the force of law." Brief for Petitioner at 63. In addition, petitioner maintains that the Commission had no authority to suspend its rates prior to issuance of Order No. 303, because the Commission's "own regulations stated it did not and the Commission had not conducted the required reassessment thereof." Brief for Petitioner at 53.

These arguments are specious. The Commission has never purported to be able to confer upon itself additional suspension powers. Its regulation providing that "[a]n initial rate cannot be suspended," 18 C.F.R. §§ 2.4, 2.52 (1983), was itself an interpretive rule. The Commission's interpretation of the FPA has *never* had the force of law. Consequently, if the FPA had conferred suspension power over initial rates on the Commission, it would always have had that authority, and it plainly would not have been required to engage in rulemaking before exercising its suspension powers in a particular case.

## IV.

For the reasons stated in Part II *supra,* we vacate the Commission's orders in Nos. 83–1810 and 83–1632, and remand to the Commission for renewed consideration of whether these filings involve changed as opposed to initial rates.

*It is so ordered.*

GINSBURG, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority on two issues: (1) contrary to the Commission's position, Order No. 303 is currently reviewable, *see* majority opinion at 772–773; (2) petitioner has no tenable basis for charging that the Commission acted ultra vires, *see id.* at 773. Further, as a "second best" disposition, I would allow FERC, as the court does, to revisit its first view of this case and determine once again whether the MSU intra-corporate agreement at issue should be characterized a change in rate instead of an initial rate filing. *See id.* at 772. On classification or qualification questions, the majority points out, *id.* at

771, judges customarily defer to the Commission's broad view.

However, as a first choice resolution of this case, I would not put FERC through characterization paces. In my view, the Commission permissibly changed course to reconcile, in the wake of *Trans Alaska Pipeline Rate Cases* (*TAPS*), 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978), oil pipeline and electric utility rate regulation. Recognizing that the question is close, I set out below the reasons why I would affirm the Commission's orders in Nos. 83–1810 and 83–1632.

For nearly a half-century, in administering the Federal Power Act (FPA) and the Natural Gas Act (NGA), FERC and its predecessor (the Federal Power Commission) exercised suspension and refund authority with respect to rate changes, but not with respect to initial rates. FERC has now determined that it may direct suspensions and order refunds for initial rates as well as rate changes. FERC's reinterpretation was prompted by the Supreme Court's interpretation, in *TAPS*, of parallel rate provisions of the Interstate Commerce Act (ICA). FERC arrived at its new view mindful that Congress had patterned the FPA, in large measure, on the ICA. *See, e.g., Public Utility Holding Companies: Hearings on H.R.5423 Before the House Committee on Interstate and Foreign Commerce,* 74th Cong., 1st Sess. 392, 2170 (1935).

*TAPS* concerned oil pipeline tariffs, formerly within the jurisdiction of the Interstate Commerce Commission, but now, together with wholesale interstate sales of electricity and natural gas, within FERC's bailiwick. *See* Department of Energy Act § 402(b), 42 U.S.C. § 7172(b) (transferring to FERC all ICA authority to regulate oil pipeline rates). The pipeline owners in *TAPS,* like the petitioner and amicus in this case, had argued that the Commission's suspension and refund authority encompassed only rate changes, not initial rates. The Court read the word "new," as used in the relevant ICA section, 49 U.S.C. § 15(7) (1976) (now amended and recodified as 49

U.S.C. § 10,708 (1982)), to cover both initial and changed rates, although instructions in the section address, with particularity, "the proposed change of rate," and "increased rates or changes ... found not justified." Congress had as its prime objective, the Court emphasized, protection of the public against "mischief" occasioned by unreasonable transportation charges. *See TAPS,* 436 U.S. at 644–45, 98 S.Ct. at 2061–62. "Given the equivalence of the harms resulting from unchecked initial and changed rates," the Court said, the distinction urged by the pipeline owners lacked cogency. *Id.* at 645,[1] 98 S.Ct. at 2062.

The matter at hand is less readily resolved, as the majority opinion demonstrates. For forty-five years, the Commission did operate on the understanding that it lacked power to suspend an initial rate, and courts simply assumed that the agency's position was correct. *See, e.g., Atlantic Refining Co. v. Public Service Commission,* 360 U.S. 378, 390, 79 S.Ct. 1246, 1254, 3 L.Ed.2d 1312 (1959) (NGA decision). The relevant FPA text and legislative history support the agency's longstanding, pre-*TAPS* interpretation, but neither the statute's text nor its history is incompatible with FERC's current view. I turn first to the statute's text, which seems to me not quite so "plain" as the majority finds it.

The statutory interpretation issue FERC resolved concerned the meaning of the words "such new schedule" in section 205(e) of the FPA, 16 U.S.C. § 824d(e) (1982). That section describes the Commission's suspension authority. The majority, distinguishing *TAPS,* underscores the word "such" in section 205(e)'s text. "Such" is indeed a restrictive word, but its use in

section 205(e) is not free from ambiguity. If "such" refers solely to the immediately preceding section, then initial filings would not be covered, because section 205(d), 16 U.S.C. § 824d(d), deals only with rate changes. On the other hand, if "such" is read to step back twice, then new starting rates would be covered, for section 205(c), 16 U.S.C. § 824d(c), speaks of "all rates and charges." FERC argued that the essential distinction Congress intended is between "new" rates and existing rates; under FERC's interpretation, *existing* rates must remain unaffected unless and until the Commission finds them excessive, but new rates, whether initial or changed, are subject to suspension. FERC Brief at 26–27. That reading seems to me both sensible and compatible with the FPA's text and history.

The statute, I believe, bears the reading FERC now gives it, and that reading, the majority agrees, *see* majority opinion at 767, 770, serves the general intent of Congress to ensure that rates be just and reasonable. If the legislative history does not instruct otherwise, FERC's current interpretation merits deferential judicial consideration. *See Chevron, U.S.A. v. Natural Resources Defense Council,* — U.S. —, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

The majority opinion makes less of the legislative history than it does of "the plain language of the statute and forty-five years of interpretation by the Commission and the courts." Majority opinion at 770 (legislative history offers "some additional support"). Understandably so. The passage quoted by the majority, *id.* at 770,

---

1. Presumably, the *TAPS* interpretation, approving suspension of initial as well as changed rates, applies to another statute FERC now administers, the Federal Water Power Act, which provides that its rate regulation procedure and practice "shall be ... as provided in the [ICA]." 16 U.S.C. § 813 (1982).

In 1976, prior to *TAPS,* Congress had confirmed what it believed to be existing law regarding rate suspension authority under the Federal Communications Act. Congress "clarified" that the Federal Communications Commission has power to suspend initial tariffs as well

as rate increases. *See* Pub.L. No. 94–376, § 2, 90 Stat. 1080 (codified as amended at 47 U.S.C. § 204 (1982)); H.R.Rep. No. 94–1315, 94th Cong., 2d Sess. 4, 6, 15–16 (1976); S.Rep. No. 94–918, 94th Cong., 2d Sess. 3, 4, 7 (1976), U.S.Code Cong. & Admin.News 1976, 1926.

Congress intended to exclude initial rates from the Civil Aeronautics Board's suspension power; it so stated, unambiguously, in the text of the governing provision. *See* Federal Aviation Act of 1958, § 1002(g), 49 U.S.C. § 1482(g) (1982).

is the *sole* reference to the suspension power in the legislative history. The brief comment mentions authorization to suspend a "change in rates," but says nothing of suspending initial rates. I draw from this only confirmation "that the primary area of congressional concern was the situation in which [utilities] increased their pre-existing rates." *TAPS*, 436 U.S. at 645–46, 98 S.Ct. at 2062.

The scant attention Congress paid to the specifics of rate suspension is not surprising. When the FPA was in the legislative hopper, the Commission's power to suspend rates and order refunds did not generate controversy. Rather, debate centered on the utilities' and state commissions' effort to contain federal regulation to interstate wholesale rates in face of the Federal Power Commission's request for enlarged jurisdiction. *See, e.g.,* S.REP. No. 621, 74th Cong., 1st Sess. 18–20 (1935); *Hearings Before the Senate Committee on Interstate Commerce on S.1725,* 74th Cong., 1st Sess. 39–44 (1935) (powers FPC requested) (hereafter, *Senate Hearings*); *id.* at 482 (statement of T. Justin Moore, Counsel to the Committee of Public Utility Execu-

tives); *id.* at 729–31 (statement of H. Lester Hooker, Chairman of Legislative Committee of National Association of Railroad & Utilities Commissioners).[2] Significantly, the FPA's legislative history contains no statement that the Federal Power Commission should be accorded suspension power less potent than that earlier accorded administrators under the ICA.

Because the "such" in the statutory text does not settle the case for me,[3] in the absence of prior close consideration of the question in the legislative history or by courts, I do attach heavy weight to Congress' "general intent." *But cf.* majority opinion at 771. "[The FPA's] primary aim is the protection of consumers from excessive rates and charges." *Municipal Light Boards v. FPC,* 450 F.2d 1341, 1348 (D.C. Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972). Focusing on that aim, I discern no intelligent reason why Congress would have wanted to direct differential treatment, now by the same agency, of oil pipeline rate regulation, on the one hand, and electric utility rate regulation, on the other, for the rate suspension purpose here in question.[4] *Cf.*

**2.** The FPA passed as part of the Public Utility Holding Company Act of 1935. In congressional consideration of the legislation, the control of public utility holding companies, not the FPA, occupied center stage. *See, e.g., Senate Hearings* at 9–10 (necessity for control of holding companies); *id.* at 68–69 (statement of Rep. Sam Rayburn); *Public Utility Holding Companies: Hearings on H.R.5423 Before the House Committee on Interstate and Foreign Commerce,* 74th Cong., 1st Sess. 1–12 (1935).

**3.** Petitioner also contended that in the original version of the FPA suspension provision, it was clear that the words "such new schedule" referred solely to "schedules stating plainly the change or changes to be made in the schedule or schedules then in force." *See Senate Hearings* at 41–42. But Congress altered the language originally proposed, and I think it inappropriate to transform the *absence of comment* on a conference committee amendment into a positive indication of legislative intent to make *no* change. *See* 1A C. SANDS, STATUTES AND STATUTORY CONSTRUCTION § 22.30, at 178 (4th ed. 1972) ("an amendment indicates that [the legislature] thereby intended to change the original [bill] by creating a new right or withdrawing an existing one"); *FTC v. Manager, Retail Credit Co.,* 515 F.2d 988, 994 (D.C.Cir.1975). Moreover, it is at

least possible that the original language indicated nothing more than a drafting slip. The original version also contained a clause grandparenting rates in use on the effective date of the FPA, "until changed under the provisions of this title." *See Senate Hearings* at 41. The function of that provision escapes easy identification unless, in its absence, the Commission could have suspended those initial rates already in use.

**4.** Petitioner stated that, in contrast to the rate uniformity required under the ICA, private contract plays a key role in rate setting governed by the FPA, and repeatedly urged that Commission suspension of initial rates filed under the FPA would mean "there would no longer be a role for contract." Middle South Energy Inc. (MSE) Brief at 42 n. 14; *see* MSE Reply Brief at 22. In developing this heated argument, petitioner cropped lines from *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956), and sought to portray dictum in that opinion as the Court's holding.

Petitioner's "contract autonomy/*Mobile*" argument distorts precedent to no avail. Petitioner acknowledges that FERC may suspend rate changes, although such changes may well be set

*Trailways, Inc. v. ICC*, 727 F.2d 1284, 1290–91 (D.C.Cir.1984) (court declines to find Congress differentiated between interstate and intrastate transport absent reliable indication that legislature "would have wanted to make such a distinction").

Petitioner's claim "that the Commission is without authority to suspend initial rates is not limited to situations in which proposed initial rates are in some sense reasonable." *TAPS*, 436 U.S. at 643, 98 S.Ct. at 2061.[5] Like the pipeline owners in *TAPS*, petitioner in this case essentially takes the position that, initially, it "can impose [and collect without risk of a refund order] any rate it chooses." *Id.* (footnote omitted). FERC seeks to enforce against petitioner the basic statutory command that "[a]ll rates ... shall be just and reasonable, and any ... rate ... that is not just and reasonable is ... unlawful." Federal Power Act 205(a), 16 U.S.C. § 824d(a).[6] The Commission wishes to accomplish its enforcement objective through a revised but plausible reading of the statute's text and history, a *TAPS*-inspired construction plainly in line with the overarching "just and reasonable rate" maintenance directive of the legislation. A court ought not block such an agency judgment. *See American Paper Institute, Inc. v. American Electric*

*Power Service Corp.*, 461 U.S. 402, 103 S.Ct. 1921, 1931–33, 76 L.Ed.2d 22 (1983) (although particular statutory language allows more than one reasonable interpretation, court accepts agency interpretation as supported by overall purpose of statute), *rev'g American Electric Power Service Corp. v. FERC*, 675 F.2d 1226 (D.C.Cir. 1982); *NLRB v. Weingarten, Inc.*, 420 U.S. 251, 264–67, 95 S.Ct. 959, 967–69, 43 L.Ed.2d 171 (1975) (earlier court and administrative precedents did not impede, or impair validity of, Board's revised, reasonable construction of statute); *see also* 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 20:11 (2d ed. 1983) (courts generally accept agency's change in course, when new interpretation is consistent with congressional intent, and agency sets forth reasons for departure from prior position).

Congress has instructed FERC to regulate wholesale interstate sales of electricity, as it regulates rates for other energy sources, in the public interest and under a "just and reasonable" standard. The Supreme Court, in *TAPS*, elaborated on that standard as stated in the ICA, and on its implementation in the context of oil pipelines. Ideally, *TAPS* and its consumer-protective rationale would have set off a con-

by contract. Initial rates, which petitioner would shield from suspension, may be set, not by contract, but by the utility's unilaterally-established tariff. Even without suspension authority, FERC already has the power to alter initial rates set by contract as soon as it determines that the rates are unreasonable. In short, the singular correlation between initial rates—as distinguished from changed rates—and contract rates necessary to make petitioner's argument coherent simply does not exist.

5. FERC's authority under the FPA, unlike the ICC's under the ICA, does not include reparations awards to direct purchasers who successfully challenge a rate as excessive; FERC therefore maintained that the need "to curb mischief flowing from unchecked initial rates," *TAPS*, 436 U.S. at 645, 98 S.Ct. at 2062, is "even stronger" with respect to electric utility rates regulated under the FPA than it is with respect to oil pipeline rates regulated under the ICA. *Middle South Energy, Inc.*, 23 F.E.R.C. (CCH) ¶ 61,277, at 61,573 (May 24, 1983).

FERC's point, the Commission itself recognized, is not major. The Supreme Court noted

in *TAPS*, 436 U.S. at 640 & nn. 18–19, 98 S.Ct. at 2059 & nn. 18–19, that a reparations remedy for the direct purchaser is of doubtful utility to the public because such purchasers often have a strong incentive simply to pass along rate excesses to their customers. As protection for the public, Commission authority to suspend rates and order refunds has far greater potency. *See TAPS*, 436 U.S. at 641, 98 S.Ct. at 2060.

6. FERC, if it has the suspension power claimed here, could suspend an initial rate for the maximum five-month period, and allow a lower rate to go into effect during that period. Then, if FERC ultimately determined that the proposed initial rate was indeed just and reasonable, the utility would suffer a loss it could not recoup. *See Tennessee Gas Pipeline Co. v. FERC*, 736 F.2d 747, 750 & nn. 4–5 (D.C.Cir.1984). In this case, however, petitioner confronts no risk that lawful charges will go unpaid. FERC has allowed petitioner to collect according to the filed rate schedule from the start of service, subject to eventual refund if the rate is found excessive.

gressional prompter, yielding statutory clarifications that would spare both agency and court the chore of deciding whether to confine the High Court's judgment to oil pipeline initial rates under the ICA, or to apply the *TAPS* holding, by analogy, to initial rates under the FPA and/or the NGA.[7] Congress, however, has not addressed *TAPS'* bounds. In the absence of further guidance from that quarter, I would defer to the rational position FERC has developed in the course of this adjudication. I would permit the agency to adopt and apply to the matter at hand the sensible principle that similarly designed legislation should be similarly interpreted.