**HOTEL & RESTAURANT EMPLOYEES UNION, LOCAL 25, et al., Appellants,**

**v.**

**ATTORNEY GENERAL of the United States, et al., Appellees.**

No. 84–5859.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 12, 1986.

Decided Oct. 31, 1986.

Rehearing En Banc Granted Jan. 12, 1987.*

Thomas F. Cullen, Jr., Washington, D.C., for appellants.

James M. Spears, with whom Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., Robert L. Bombaugh, Director, Office of Immigration Litigation, Civil Division, U.S. Dept. of Justice, Thomas W. Hussey, Asst. Director, Mark C. Walters and Michael Jay Singer, Washington, D.C., were on brief, for appellees.

Before ROBINSON, MIKVA and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

Opinion concurring in part and dissenting in part filed by Circuit Judge SILBERMAN.

MIKVA, Circuit Judge:

Illegal aliens in the United States face the constant possibility of deportation. Attempting to remove this omnipresent threat, the plaintiff union brought suit in district court against the United States Attorney General and the Secretary of State. The co-plaintiff, Mauro Hernandez, is a Salvadoran national currently residing in the United States and subject to deportation. Plaintiffs sought extensive revisions in the procedures used by the Immigration and Naturalization Service (INS) in its treatment of Salvadoran aliens. Plaintiffs also alleged that Salvadoran nationals are entitled to a decision by the Attorney General that he will temporarily suspend deportation proceedings against them for humanitarian reasons; aliens covered by such a decision possess "Extended Voluntary Departure" (EVD) status.

After the parties conducted extensive discovery, the district court granted summary judgment for defendants on both the challenge to the INS' procedures and the claim for EVD status. For the reasons stated below, we affirm in part, and reverse and remand in part. We agree with the district court that plaintiffs had standing to sue and that their claims were ripe for judicial decision. We also affirm the

district court's ruling that no material issues of fact remained in dispute between the parties as to plaintiffs' challenge to the Attorney General's decision to deny EVD status, and that defendants were entitled to judgment as a matter of law on this issue. However, we reverse the district court's grant of summary judgment to defendants on plaintiffs' INS asylum procedures claim. We cannot ascertain the court's reasoning in ruling on the summary judgment motion while two of plaintiffs' discovery requests were pending, and remand to the court for its resolution of those matters.

## I. BACKGROUND

### A. *The Broad Statutory Mandate of the Immigration and Naturalization Service*

In reviewing the INS' discharge of its duties, we must bear in mind the limited scope of our inquiry. Our precedents "'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977) (quoting *Shaughnessy v. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953)). The political branches, of course, must respect the procedural requirements of due process. As Justice Frankfurter has observed, however, "[t]hat the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government." *Galvan v. Press*, 347 U.S. 522, 531, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1954). In accordance with Congress' plenary authority to regulate aliens, the Court has recognized that some congressional rules, validly applied to aliens, "would be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 80, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976).

In the Immigration and Nationality Act of 1952 (the Act), 8 U.S.C. § 1101 *et seq.*

(1982), Congress exercised its plenary power over immigration. The statute regulates the conditions under which aliens may enter and remain in the United States, and vests in the Attorney General broad authority to enforce these conditions. The Act directs that illegal aliens are to be deported by order of the Attorney General upon a determination that they were excludable at the time of their entry into the United States or that they entered the country without inspection. *Id.* § 1251(a) (setting forth categories of deportable aliens). To fulfill this statutory mandate, the Attorney General is authorized to "establish such regulations ... and perform such other acts as he deems necessary." *Id.* § 1103(a). The INS, in turn, possesses the delegated authority of the Attorney General to enforce the immigration and nationality laws. *See* 8 C.F.R. § 2.1 (1985).

While the Attorney General and his delegates possess broad latitude in enforcing the Act, they must respect the procedural rights Congress has granted to aliens facing deportation proceedings. INS determinations of deportability are made in an adversarial hearing before an immigration officer, following notice to the alien of the specific charges against him. 8 U.S.C. § 1252(b). At this hearing the alien has the right to be represented by counsel, to introduce evidence, and to cross-examine evidence put on by the INS. *Id.;* 8 C.F.R. § 242.16. The alien may appeal the immigration judge's decision to the Board of Immigration Appeals (BIA), 8 C.F.R. §§ 236.7 & 242.21, and the Board's decisions in turn are reviewable by the United States Courts of Appeal. 8 U.S.C. § 1105a(a).

Congress has established various avenues for obtaining an exemption from deportation. Applying for political asylum is one such exemption. The Refugee Act of 1980 requires the INS, under procedures established by the Attorney General, to grant political asylum to any applicant who qualifies as a "refugee." *Id.* § 1158(a); *see also* 8 C.F.R. Part 208 (1985) (procedures for reviewing applications for asylum). A refugee, in turn, is defined as a person who is outside any country of that person's nationality and who is unwilling or unable to return to his country because of persecution or a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). An alien seeking refugee status has the burden of establishing that he meets the statutory standard as a refugee in order to qualify for asylum. 8 C.F.R. § 208.5.

To seek asylum, an alien may apply to an INS district director. *Id.* § 208.3(a). The district director's decision is not subject to review, *id.* § 208.8(c), but the alien may renew the application in the event that the INS later begins deportation proceedings against him. If the INS has already commenced deportation proceedings against him, an alien may apply for refugee status to the immigration judge who is presiding over the pending proceeding. 8 U.S.C. § 1253; 8 C.F.R. §§ 208.3(b). An alien may seek review of the immigration judge's asylum decision by the normal appeal route.

Whether the asylum application comes before a district director or an immigration judge, INS regulations require the decision-maker to request an advisory opinion from the State Department's Bureau of Human Rights and Humanitarian Affairs (BHRHA). 8 C.F.R. § 208.7; § 208.10(b). The purpose of this requirement is to assure that the INS draws upon the expertise of the State Department in refugee matters. When such an advisory opinion is sought from the BHRHA, the Office of Asylum Affairs (OAA) is primarily responsible for preparing it. Within the OAA, the official responsible for applications submitted by aliens from Latin American, Central American, and Caribbean countries is a former Foreign Service officer and now a part-time contract employee of BHRHA. The same official has reviewed applications for asylum since 1974. After reviewing the available materials, and sometimes drawing upon the country-specific expertise of other State Department employees, he

issues an opinion on each application. The opinion is reviewed by the Public Policy Officer for the Bureau of Inter-American Affairs at the State Department. The opinion letter is then signed by the Director of OAA and forwarded to INS.

When the application returns to INS, the applicant may inspect, explain, and rebut the Bureau's advisory opinion. 8 C.F.R. § 208.10(b). The INS decisionmaker must examine the individual asylum applicant personally before resolving the application. *Id.* § 208.6. In the vast majority of cases, the INS has denied Salvadorans' applications for asylum.

In contrast with asylum, which is a statutory exemption from deportation for individual aliens, Extended Voluntary Departure (EVD) is a discretionary suspension of deportation proceedings applicable to particular groups of aliens. While the Attorney General has exercised his discretion to suspend deportation proceedings against nationals of other countries for a variety of reasons, he has declined to grant EVD status either to all Salvadorans or to a more narrowly defined subgroup. In making this determination, the Attorney General cited both political and economic factors. Letter from Attorney General William French Smith to Congressman Lawrence J. Smith (July 19, 1983), Jt. App. tab. 18, at 2. Thus, the legality of a Salvadoran's presence in the United States depends on either a valid entry visa, a grant of political asylum, or the receipt of another exemption, from the Act's provisions.

### B. *District Court Proceedings*

In August 1982, plaintiffs filed suit in the United States District Court for the District of Columbia. The suit charged the Attorney General and the Secretary of State, *inter alia,* with violating the constitutional and statutory rights of Salvadorans. The plaintiffs challenged the procedures used by the INS in determining an alien's eligibility or ineligibility for refugee status and hence political asylum. Specifically, the plaintiffs alleged that the INS' use of advisory opinions rendered by the Department of State denied due process of law and violated the statutory requirements for making these decisions. The plaintiffs also alleged that the Attorney General's withholding of EVD status for Salvadorans was inconsistent with past practice and violated the due process rights of union members. In April 1983, the district court denied defendants' motions to dismiss for lack of standing and for failure to state a claim upon which relief could be granted. *Hotel & Restaurant Employees Union Local 25 v. Smith,* 563 F.Supp. 157 (D.D.C.1983). After extensive and expedited discovery, the defendants moved for partial summary judgment on both counts. In September 1984, while discovery motions were still pending, the court granted summary judgment for defendants on both the EVD and the asylum issues. *Hotel & Restaurant Employees Union Local 25 v. Smith,* 594 F.Supp. 502 (D.D.C.1984).

### II. THRESHOLD ISSUES

### A. *Standing*

■ Appellees argue that plaintiffs lack standing; they contend that neither the individual nor the organizational plaintiff has alleged cognizable injury as a result of defendants' activities. We hold, however, that the plaintiffs have standing to sue. Mauro Hernandez, whose application to an INS district director for asylum has been denied, alleges that the INS' consultative procedures with the Department of State, and the agency's refusal to grant EVD to Salvadorans, are illegal and cause him injury. Hernandez's allegation of concrete, redressable harm to his rights as an alien is sufficient to confer standing. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975); *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973).

The standing question is admittedly closer for the plaintiff organization, Local 25 of the Hotel and Restaurant Employees Union, AFL–CIO. The union states that approximately one thousand of its members are Salvadorans now present in the United States; some of these members are illegal

aliens under threat of deportation. The union argues that it has standing to participate in this lawsuit because its activities and interests, as an organization, are hindered by the procedures that defendants follow against its Salvadoran members. In addition, the union argues that it is the proper representative to bring suit on behalf of its members who are Salvadoran aliens. After examining plaintiffs' complaint, we agree with the district court that the union has standing to bring suit under either of its theories.

 To establish standing to sue on its own behalf, the union must "plausibly (1) allege injury in fact derived from the agency's action or inaction [and remediable by the court's order to defendant], and (2) assert that the injury is arguably within the zone of interests protected or regulated by the law on which the complaint is founded." *Capital Legal Foundation v. Commodity Credit Corp.*, 711 F.2d 253, 259 (D.C.Cir.1983). This first requirement contains three constitutionally mandated components—there must be injury in fact, it must be traceable to the defendant's allegedly unlawful conduct, and it must be likely to be redressed by the relief requested. *See Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 936 (D.C.Cir.1986). The second, zone-of-interests requirement is a prudential one. *See Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

 We hold that the union has satisfied each of the constitutionally required components of standing. The allegation of injury "need not be large or intense; an 'identifiable trifle' suffices." *Action Alliance of Senior Citizens*, 789 F.2d at 937 (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973)). The union in this case has plausibly alleged more than a trifle; it asserts that it has suffered a diminution of its ability to organize and retain Salvadorans as union members and to protect the rights of its members to be secure in their jobs. The union has also

satisfied the causation requirement. Plaintiff traced a direct line between defendants' actions and its own alleged injuries. According to the union, defendants' denial of relief from deportation and illegal denial of asylum status subjects Salvadoran aliens to employer pressure to remain silent or else be reported for deportation, and that their resulting unwillingness to press their grievances against their employers hinders the union's activities. Finally, the redressability requirement is satisfied; the court could order relief, such as requiring the INS to make revisions in its decisionmaking procedure for asylum applications or the granting of EVD, that would end the union's injury.

We are baffled by the separate opinion's claim that Local 25's complaint "does not meet the bedrock constitutional requirement[s]." Separate Op. at 1273. The separate opinion charges that Local 25 cannot demonstrate any link between the injury of which it complains, impairment of the union's organizational activities, and the alleged procedural flaws in the INS' scheme for granting political asylum. *Id.* This argument is both incorrect and incomplete. It is incorrect because it misstates and trivializes the union's explanation of how and why its claimed injury is fairly traceable to illegal actions by defendants. The separate opinion simply assumes, without explanation, that insecurity among Local 25's Salvadoran members is the only possible damper on union activities, *id. infra* at 1273–74, and then states conclusorily that "it cannot be concluded that that insecurity is attributable to the procedural irregularities that allegedly mark the political asylum system." Separate Op. at 1274. It seems presumptuous for the federal judiciary to claim that since illegal aliens are generally insecure, any particularized insecurity limited to a smaller segment of illegal aliens cannot possibly be occasioned by the INS' procedures for processing asylum applications.

The separate opinion also questions whether insecurity among employees undermines a labor union's activities, since a

union acts to alleviate its members' fears and concerns. A moment's reflection will reveal that no such generalization is possible. The nub of the union's claim is that its members' apprehensions resulting from INS procedures hinder the union's ability to address those employee grievances which may arise in any employment relationship. More importantly, no such generalization is necessary; the union's allegations must be taken as true for the purpose of determining whether plaintiff has standing. *See Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. at 2206.

In addition, the separate opinion's argument is incomplete because it cavalierly brushes aside the claim for EVD. *See* Separate Op. at 1276 n. 8. The union plainly alleged that the denial of EVD hindered its functioning as a labor organization. Amended Complaint at 3. This claim alone is a sufficient allegation of a concrete, redressable injury attributable to defendants' actions. Clearly the suspension of deportation proceedings, which is one of the remedies sought by plaintiff, would alleviate the injuries which the union claims it now suffers as a result of defendants' actions.

■ Having concluded that the union has satisfied the constitutional requirements for standing to sue on its own behalf, we now turn to the prudential requirement that the interest plaintiff seeks to protect be "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). We have held that the zone test is "passed if a plaintiff's interest in the agency action appears to fall within the ambit of the constitutional clause, statute, or regulation allegedly violated." *Capital Legal Foundation,* 711 F.2d at 259 (footnotes omitted). The union's interest here falls within the zone of interests protected by the statutes at issue. The union seeks protection of an organizational interest; that interest is in seeing that potential members obtain lawful and secure entry status to this country and are accordingly free from the threats of third parties, such as employers, to report them for deportation proceedings if they report grievances or demonstrate pro-union tendencies. The Refugee Act of 1980 and the Immigration and Nationality Act, by erecting a complex scheme of substantive and procedural safeguards for aliens, protect this same interest in secure entry status.

The separate opinion expresses doubt that the prudential requirement of standing is satisfied, asserting that labor unions are not intended beneficiaries of the Refugee Act of 1980. As ostensible proof of this proposition, the separate opinion notes that unions fall within the zone of interests of immigration laws limiting the entry of foreign workers and therefore implies that they cannot fall within the zone of interests protected by the political asylum exception to those laws. Separate Op. at *infra* 1273 n. 2. That observation creates a false dichotomy. The granting of political asylum and the imposition of limitations on the entry of foreign workers take place under two separate statutory schemes which each protect different zones of interests, for different unions under different circumstances. Whatever interest organized labor in general may have in limiting foreign workers, we conclude that Local 25 of the Hotel and Restaurant Workers asserts and describes a statutorily protected interest in its actual and potential members' access to the opportunities for asylum offered by the Refugee Act. The union is therefore within the zone of interests protected by the statute.

We now turn to an independent basis for standing which the union asserts. As well as claiming standing in its own right, the union asserts that it has standing to bring suit on behalf of its members. In resolving the question of an organization's standing as a representative of its members, we are guided by the principles set forth in *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), which the Supreme Court has recently reaffirmed. *See International Union v. Brock,* — U.S. —,

106 S.Ct. 2523, 2533, 91 L.Ed.2d 228 (1986). *See also Action Alliance of Senior Citizens,* 789 F.2d at 939 n. 10; *National Treasury Employees Union v. Merit Systems Protection Board,* 743 F.2d 895, 910 (D.C. Cir.1984). In *Washington Apple,* a trade association, created to promote the apple industry of Washington state, sought to challenge a federal regulation barring the promotion of Washington-grown apples in another state. In deciding that the association had standing, the Court set forth a three-part test to evaluate claims of organizational standing. First, if the association's members were plaintiffs, they must have standing to sue in their own right. Second, the interests the organization seeks to protect must be germane to its purpose. Finally, neither the claim asserted nor the relief requested must require individual members to participate in the organization's lawsuit.

██ Accepting the union's allegations as true, we find that the union has satisfied the requirements set forth in *Washington Apple* for organizational standing. The first requirement is satisfied if the association's members, " 'or any one of them, are suffering immediate or threatened injury as a result of the challenged action.' " *Central & Southern Motor Freight Tariff Ass'n v. United States,* 757 F.2d 301, 312 (D.C.Cir.) (quoting *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975) (emphasis added)), *cert. denied,* — U.S. ——, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). We have no doubt that at least one of the union's Salvadoran members, Mauro Hernandez, would otherwise have standing to sue in his own right; the government's immigration procedures and processing of asylum applications directly affects him, his activities, and his willingness to enter public life. Hernandez's standing is sufficient to satisfy this element of the *Washington Apple* test.

Overlooking this point, the separate opinion maintains that the union's members would not have standing to sue in their own right because they have not applied for and been denied political asylum and

therefore have not been harmed by the INS' procedures. Even those members who have not applied for asylum, however, would have standing by alleging harm as a result of the agency's asylum procedures and its denial of EVD.

Continuing with the *Washington Apple* test for organizational standing, it is also clear that the plaintiff's theory of the case and the remedies it seeks do not require the participation of individual aliens. The union challenges the government's procedures for processing asylum applications, not its disposition of any asylum request.

Thus, our inquiry narrows to whether the interests the union seeks to protect are germane to the union's purpose. We hold that they are. The union's purposes include, *inter alia,* organizing all workers within its jurisdiction and protecting its members. Hotel & Restaurant Employees Local 25, AFL–CIO Bylaws (1977), Art. I, Sec. 2. The union stated that the government's current asylum and deportation policies keep aliens out of the mainstream of the association's business. Understandably fearful and unwilling to come forward, illegal aliens employed by hotels and restaurants in the Washington area do not identify themselves to the union, do not make known their grievances against their employers, and do not become involved in union activities. This reticence directly hinders the union's purpose of organizing and serving workers in the hotel and restaurant field. Affidavit of Ronald Richardson, Executive Secretary-Treasurer of the Union, at 2 (Nov. 4, 1982). The union's current effort to protect its members' interest in reformed asylum and deportation procedures is therefore germane to the union's activities as an organization. We conclude that the union has standing to sue on behalf of its members.

The separate opinion cries wolf, arguing that under the reasoning we adopt today, a union could challenge the enforcement of any laws at all, including narcotics statutes, against its members. Separate Op. at 1276. We think this charge misinterprets our holding and our reading of the prece-

dents upon which we rely. It also ignores the unique facts of this case. The crucial point is not the union's bare allegation that prosecution of the laws impairs its organizational activities. The dispositive consideration is, as the separate opinion apparently recognizes, that "the rights sought to be vindicated are the sort of rights that by their *nature* relate to a particular organization." Separate Op. at 1276. Thus in *Washington Apple,* the Court found that the interests asserted by plaintiff, an organization that performed the functions of a traditional trade association, satisfied the "germaneness" requirement for organizational standing. The Court noted that the Commission's challenge to the marketing statute at issue was "central to the Commission's purpose of protecting and enhancing the market for Washington apples." 432 U.S. at 344, 97 S.Ct. at 2442.

The precedents within our circuit also have found the "germaneness" requirement satisfied when the association's purposes are reasonably related to the challenge it seeks to bring. In *NTEU, supra,* we held that the NTEU's interest in the rights of its seasonal workers to statutory protections against adverse actions was germane to its purposes as exclusive representative of those workers. 743 F.2d at 910. In *West Virginia Ass'n of Community Health Centers, Inc. v. Heckler,* 734 F.2d 1570, 1574 n. 4 (D.C.Cir.1984), we held that an association has standing to challenge the Secretary of HHS' formula for awarding block grants for primary medical care; we had "little doubt that WVACHC is a proper representative." Likewise, the union's challenge here to the INS' treatment of illegal Salvadoran aliens is central to its purpose of protecting the rights of its members, some of whom are illegal Salvadoran aliens. In summary, the wholly sufficient reply to the separate opinion's professed concerns about the breadth of our holding is that the threatened deportation of actual and potential union members is germane to the union's interests in a way that the potential prosecution of actual and potential members for narcotics offenses, for example, simply is not. The interest in all law enforcement does not meet the germaneness test, but it does not necessarily follow that a particularized interest in the enforcement of a particular statute fails the test.

In addition to misreading *Hunt,* the separate opinion overlooks the EVD claim as an integral part of plaintiff's claim for organizational standing. In arguing that aliens' claims for procedural regularity "simply do not implicate the functions of a union *qua* union", Separate Op. *infra* at 1276, the separate opinion ignores the fact that the Attorney General's decision not to grant EVD status implicates the organizational functions of the union. As we have already observed, the fact that illegal aliens who work in Washington, D.C. area hotels and restaurants are subject to deportation is germane to the union's central purposes.

## B. *Ripeness*

■ While the doctrine of standing inquires which parties may institute a claim for relief, the ripeness doctrine asks when a court may appropriately consider the claim. *See Action Alliance of Senior Citizens,* 789 F.2d at 940. In determining whether appellants' claims lend themselves to immediate judicial resolution, we note that their challenge is to the manner in which the INS handles all Salvadoran asylum applications under the immigration laws, not to the agency's treatment of any one application. Appellees therefore miss the mark in arguing that judicial resolution would be premature solely because the agency has not denied any identifiable union member's asylum application and has not commenced deportation proceedings against that person. The procedures and policies that the INS and the State Department follow are well-established and formalized; they represent the final product of the agency's deliberations on which procedure to follow in administering the immigration laws.

Recognizing that the "agency action" challenged here is the INS' procedure for processing asylum applications, the district court held that the case was ripe for judi-

cial review. We agree. Courts are required by *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), to examine both the fitness of the issues for judicial review and the hardship that withholding court consideration would cause to the parties. *Id.* at 149, 87 S.Ct. at 1515. This inquiry is "very much a matter of practical common sense." *Continental Air Lines v. CAB,* 522 F.2d 107, 124 (D.C. 1974) (*en banc*). In following the dictates of *Abbott Laboratories,* we must inquire whether "the interests of the court and agency in postponing review until the question arises in some more concrete and final form" are outweighed by the interest of those who seek relief from the immediate and practical impact of the challenged action upon them. *Diamond Shamrock Corp. v. Costle,* 580 F.2d 670, 672 (D.C.Cir. 1978); *see also Action Alliance of Senior Citizens,* 789 F.2d at 940; *Continental,* 522 F.2d at 125.

Applying this test, we find that the legality of the INS' present procedures is well-suited to judicial review. There would be a strong interest in postponing review if the INS were likely to abandon or modify its treatment of Salvadoran asylum applications before putting it into effect. *Continental,* 522 F.2d at 125. In this case, however, the INS has stated that it follows a clear and ongoing procedure in dealing with these asylum applications. This procedure has been made final, and the agency has implemented its consultative procedures with the State Department. The action plaintiffs challenge here is much more akin to a final agency action than to a tentative agency policy. Thus judicial review will not interfere with the agency's development of a final decision or misuse the court's resources.

Proceeding to the second prong of the ripeness inquiry, we must evaluate the "present damaging effect" of the challenged action upon appellants to determine whether it outweighs the interest in postponing review. *Diamond Shamrock,* 580 F.2d at 673. The hardship inquiry focuses upon whether "the impact of the administrative action could be said to be felt immediately by those subject to it in conducting their day-to-day affairs." *Toilet Goods Association, Inc. v. Gardner,* 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967). Bearing in mind that plaintiffs' claims are fit for review, we also find that the challenged actions have a direct impact upon appellants. The agency's current policies and procedures immediately and unquestionably affect appellants. These actions have a direct and practical effect upon an alien's day-to-day activities as an employee and as a person subject to deportation. As we noted in our analysis of the union's standing, the INS' procedures also affect the union's day-to-day organizational activities. In summary, our adjudication of this case does not threaten judicial entanglement in "abstract disagreements over administrative policies." *Abbott Laboratories,* 387 U.S. at 148, 87 S.Ct. at 1515. Appellants challenge a procedure that is already in use. The case is ripe for review.

Without challenging these conclusions, the separate opinion applies an erroneous view of ripeness doctrine. According to the separate opinion, Hernandez's claim is not ripe "because the political asylum scheme contemplates further administrative procedures before the denial of asylum is finalized, and because Hernandez will not be irrevocably injured if review is postponed." Separate Op. *infra* at 1277. The separate opinion first argues that Hernandez may not be deported until after he has been through a deportation proceeding and had the opportunity to reapply for asylum to an immigration judge. There is no question that the agency's initial rejection of Hernandez's bid for asylum is not "its final or definitive decision on the matter," Separate Op. *infra* at 1278, of Hernandez's ultimate deportability. There is also no question that this observation is irrelevant to the ripeness inquiry. If this case were a challenge to the INS' deportation of Hernandez, then its adjudication would be premature as long as the INS had not rendered a final decision to deport him. But this lawsuit is different; it is a challenge to the legality of the INS' procedures at the initial steps of

the entire deportation process. It bears repeating that plaintiffs seek revisions in the process by which the INS initially decides whether to grant asylum to illegal aliens who apply for it.

The agency position on this issue is clear; it has no legitimate interest in postponing judicial review of it. In a strained effort to identify the court's "significant interest in deferring review," Separate Op. *infra* at 1278, the separate opinion advances an unsound and unsupported theory. The opinion notes that a change in position by the agency as to Hernandez's case would render judicial review of his claim unnecessary, and would also enable the court to avoid reaching the merits of this case. According to this view, no petitioner may obtain review of an agency procedure or decision, no matter how illegal or irrational it may be, as long as the agency still has the option of taking a later step that would provide petitioner with relief similar to that which he seeks through his lawsuit. This argument also overlooks the fact that the agency's position on its procedures for processing asylum applications is clear and final.

Finally, the separate opinion argues that Hernandez will suffer no irreversible hardship if review is delayed. This conclusory assertion rests on the assumption that the only possible irreversible hardship is the occurrence of deportation. Yet plaintiff's theory of the case makes it clear that the union and its members perceive hardship much earlier than actual deportation. It is the alleged shortcomings in the INS' procedures and practices that pervasively hinder the union in its activities and the illegal alien who hesitates to be an outspoken employee and an involved community member. This hardship, suffered in the present, cannot be reversed even if the individual applicant ultimately prevails and obtains asylum or other relief from deportation.

The separate opinion's treatment of the ripeness issue suffers greatly from a confusion between an individual's challenge to the final result in a specific deportation proceeding, and a structural challenge to the INS' handling of asylum applications. As a result, the separate opinion treats Hernandez's claim as not ripe due to a misperception that he is merely challenging the agency's treatment of a particular application. *See* Separate Op. *infra* at 1277–1278. This is a fundamental misunderstanding. Hernandez, like the union, is challenging the INS' entire framework for processing asylum applications. The fact that Hernandez could obtain relief from deportation in a later proceeding focused on his application does not *ipso facto* render unripe the prior and different challenge which he now raises. As we have concluded, this challenge is ripe for review.

## III. The Asylum Applications of Salvadorans

Plaintiffs mount a broad attack on the INS' handling of Salvadorans' applications for asylum. Their argument, in essence, is that these applications do not receive all the scrutiny that is due them. They argue that the due process clause and the Act both require more thorough and more individualized consideration of asylum applications than they now receive.

They attempt to demonstrate the alleged shortcomings of current INS procedures in several respects. First, they argue that the employees in the State Department who recommend dispositions of these applications are poorly trained, unversed in the politics of central America, and inadequately supervised. Plaintiffs maintain that the procedures give principal control to a political and policy-oriented branch of the State Department and permit only a minimal amount of time for review of each individual application. They also allege that foreign policy considerations play an illegitimate role in the consideration of these applications.

Before evaluating these substantive challenges, we must examine the district court's determination that defendants' summary judgment motion was ripe for review. Appellants argue that the district court prematurely terminated their efforts

to develop an evidentiary record without which the court's legal analysis is unfounded. In granting summary judgment, the district court failed to articulate its reasons for not permitting the further discovery requested by plaintiffs. Without this explanation, we cannot adequately review the propriety of the district court's apparent conclusion that plaintiffs received adequate opportunities to uncover material issues of fact, and failed to do so. We therefore remand to the district court for a ruling on the discovery matters, and do not reach the issue of whether defendants were entitled to judgment as a matter of law.

### A. *The Posture of the Case Upon Summary Judgment*

As the linchpin in establishing a due process violation, plaintiffs sought to uncover conclusive evidence that the INS was merely "rubber-stamping" the BHRHA's advisory opinion in every case. The plaintiffs argued that the INS' allegedly *pro forma* approval of recommendations rendered by the Office of Asylum Affairs denied Salvadoran aliens their right to an asylum hearing before either an immigration judge or the Deputy Director. During discovery both parties took extensive depositions, produced numerous documents, and responded to lengthy interrogatories. Nevertheless, two of plaintiffs' document requests pertaining to the asylum issue were still outstanding when the district court ruled on defendants' summary judgment motion.

Plaintiffs sought two sets of documents. First, they requested to review the individual INS file for each Salvadoran national who applied for asylum ("the A files"); the INS has established an A file for every asylum applicant. Second, they sought a breakdown by nationality of the State Department's recommendation rates of asylum. Defendants objected to these requests, claiming that they were "oppressive and unduly burdensome," "immaterial and irrelevant," and that "[t]o disclose the documents requested would violate the confidentiality which [the defendants] traditionally extended to the files of aliens and would violate their right to privacy." Responses and Objections by Defendants to Plaintiffs' Second Request for Production of Documents, filed Oct. 17, 1983, at 1–2, 3.

Without having produced the requested documentation, defendants moved for partial summary judgment on the asylum issue. Thereafter, plaintiffs moved to compel discovery and requested in camera review of the allegedly confidential records. In response, defendants filed a motion for a protective order seeking denial of plaintiffs' motion to compel and preclusion of further discovery until the court ruled on their dispositive motion. The district court held a status call at which it entertained pending motions but did not dispose of the relevant discovery issues, indicating it would take the parties' motions under advisement. The district court apparently had not ruled on the cross-motions when it heard oral argument on defendants' motions for summary judgment. Appellants' Brief at 22.

### B. *The Appropriateness of Summary Judgment*

Appellants argue that by granting summary judgment to defendants the district court improperly aborted essential factual development and therefore the court's legal analysis cannot be supported. Essentially, appellants contend that they would have been able to raise genuine issues of fact in opposition to defendants' motion had their discovery requests been granted. They accordingly conclude that defendants' summary judgment motion was not ripe.

On a motion for summary judgment, the court cannot try issues of fact. It must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, with the burden on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *Abraham v. Graphic Arts International Union*, 660 F.2d 811, 814 (D.C.Cir.1981). Ordinarily, "summary judgment motions [are] premature until all discovery has been

completed." *City of Rome v. United States*, 450 F.Supp. 378, 384 (D.D.C.1978) (Richey, J.) (granting motion for extension of time until completion of all discovery and resolution of all discovery disputes). A district court, however, has broad discretion over the scope of discovery. 8 C. Wright & A. Miller, Federal Practice and Procedure § 2036, at 267–68 (1970). Although this broad power cannot excuse a grant of summary judgment in the face of an issue of fact, it is discretionary with a trial court whether to deny summary judgment in response to a motion seeking additional discovery. *See Nixon v. Freeman*, 670 F.2d 346, 363–65 (D.C.Cir.), *cert. denied sub nom. Nixon v. Carmen*, 459 U.S. 1035, 103 S.Ct. 445, 74 L.Ed.2d 601 (1982). Thus our standard of review is abuse of discretion. *Id.;* 6 Part 2 Moore's Federal Practice, ¶ 56.24, at 56–1428 (1982).

Under Rule 56(f), the district court may defer ruling on a motion for summary judgment and permit further discovery so that the nonmoving party may obtain the information necessary to show an issue of material fact in dispute. Fed.R.Civ.P. 56(f). The nonmoving party, however, has the burden of showing the trial court what facts he hopes to discover that would create a triable issue and what reason justifies his inability to produce them on the motion. *Exxon Corp. v. FTC*, 663 F.2d 120, 126–27 (D.C.Cir.1980).

Appellants attempted to meet this burden. In opposing defendants' motion for partial summary judgment, plaintiffs urged the district court to deny the motion and allow their challenge to proceed through discovery to trial. They complained that they were unable to establish the impact of State Department advisory opinions on Salvadoran applicants "because the defendants have withheld discovery which would allow tracing and comparison of recommendations and results even on a sample basis." Corrected Copy of Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Partial Summary Judgment on the Asylum Issue, filed Jan. 4, 1984, at 35.

■ Normally, in order to stay consideration of the summary judgment motion, a nonmoving party files an affidavit outlining his position. *See* Fed.R.Civ.P. 56(f). Although several courts which have considered the issue agree that filing an affidavit is necessary for the preservation of a Rule 56(f) contention, *see Mid-South Grizzlies v. National Football League*, 720 F.2d 772, 780 n. 4 (3d Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984), other courts have assayed Rule 56(f) showings made in summary judgment opposition papers together with outstanding discovery requests, *see, e.g., id.; Wallace v. Brownell Pontiac-GMC Co., Inc.*, 703 F.2d 525, 527–28 (11th Cir.1983); *Nixon*, 670 F.2d at 363–65. We find this practice sensible under the present circumstances. The district court's refusal to stay consideration of defendants' motion pending further discovery is not automatically justified by appellants' failure to file a Rule 56(f) affidavit.

The purpose of the affidavit is to ensure that the nonmoving party is invoking the protections of Rule 56(f) in good faith by affirmatively demonstrating why he cannot respond to the summary judgment motion. The procedure is designed to prevent fishing expeditions by narrowing the scope of discovery and affording the trial court the showing necessary to assess the merit of a party's opposition. *See First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 298, 88 S.Ct. 1575, 1597, 20 L.Ed.2d 569 (1968). There is no question that the district court was positioned to judge appellants' plea for further discovery. Appellants' outstanding discovery requests identified the information sought with specificity; their opposition papers outlined the use they sought to make of the information which remained in defendants' hands.

■ Plaintiffs sought to examine the A files to establish empirical correlations between the State Department's asylum recommendations and the INS' decisions to grant or deny asylum. Plaintiffs believe that this statistical information will demon-

strate complete INS deferral to State Department recommendations in violation of 8 U.S.C. § 1158(a), which vests asylum decisions in the Attorney General. In plaintiffs' view, the denial of discovery into this information prevented them from establishing the impropriety of the State Department's involvement in the asylum process. Plaintiffs also argue that the district court's denial of discovery of the statistics concerning the State Department's recommendation rates by nationality denied them the opportunity to demonstrate that, contrary to the Refugee Act of 1980, El Salvadorans were being treated less favorably than aliens of other nationalities. Although we express no view as to the likelihood that these particular data will enable plaintiffs to raise a genuine issue of material fact, we note that statistical evidence alone, if sufficiently condemning, is capable of withstanding a motion for summary judgment. *See McKenzie v. Sawyer,* 684 F.2d 62, 71 (D.C.Cir.1982) (Title VII); *Thompson v. Sawyer,* 678 F.2d 257, 284 (D.C.Cir.1982) (same); *see also Teamsters v. United States,* 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977) (same).

In granting summary judgment, the district court identified the issue between the parties as the "propriety of the Department of State's involvement in INS asylum decisions." 594 F.Supp. at 510. The court ruled that there were no genuine issues of fact in dispute. It perceived the issues as "purely a question of law." Thus, in the court's view, the issues may appropriately be resolved by summary judgment. *Id.*

The district court offered no reasons for declining to permit further discovery before ruling on defendants' summary judgment motion. Indeed, plaintiffs' attempt to seek Salvadoran A and other files for tracing and comparison was never addressed. Plaintiffs' Motion to Compel remained unresolved. At best, we can imply denial of the pending discovery motions from the court's unexplicated, conclusory statement: "There are no genuine issues of fact in dispute here." *See* 594 F.Supp. at 510.

We cannot adequately assess the propriety of the district court's exercise of discretion without articulation of its reasoning. It is impossible to determine if the court based its decision to deny plaintiffs' discovery requests on its belief that the extreme burden of the production would outweigh its probativeness, or that the personal nature of the documents precluded their release, or that the information sought was irrelevant to the litigation. We therefore reverse the judgment and remand to the district for its ruling and reasoning on plaintiffs' two document requests. Our holding, of course, reflects no opinion on the merits of the case.

## IV. EXTENDED VOLUNTARY DEPARTURE

The Attorney General enjoys broad latitude in enforcing the immigration laws. *See* 8 U.S.C. § 1103(a) (authorizing Attorney General to establish such regulations and perform such other acts as he deems necessary to carry out his authority). The decision to grant or to withhold EVD falls within this broad mandate. On several occasions in the past, the Attorney General has granted EVD by temporarily suspending enforcement of the Act for a particular group of aliens. Letter of Attorney General to Congressman Lawrence J. Smith (July 19, 1983), Jt.App. tab 18, at 1. The Attorney General has determined that circumstances do not warrant granting EVD to Salvadoran aliens. This assessment was based upon: (a) the number of Salvadoran aliens already in this country; (b) "the current crisis in which our country is experiencing a 'floodtide' of illegal immigrants"; (c) the prospect of inducing further immigration by Salvadorans; (d) the effect of illegal immigration on the United States' finite law enforcement, social services, and economic resources, and (e) the availability of statutory avenues of relief, including application for asylum. *Id.* These factors correspond to the Secretary of State's description of the EVD process: the State Department "invariably considers a number of factors in deciding whether to recommend the granting of EVD in any partic-

ular case, and the granting of EVD may meet different objectives in different cases." Letter from George P. Schultz to William French Smith (June 23, 1983), Jt. App. tab 17, at 1.

■ We have no doubt that the EVD issue was properly disposed of by summary judgment. Appellants argue that they were denied the opportunity to develop facts analogous to an administrative record to test the Attorney General's exercise of his discretion. This contention misses the point. Further factual development would not have sharpened the issues before the district court. The initial, and dispositive, issue was simply whether the court could review the Attorney General's discretionary withholding of EVD status.

The district court properly interpreted the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (1982), as barring judicial review of the Attorney General's decision not to grant EVD status in this case. An agency action is subject to review only if it is "made reviewable by statute or if it is a final agency action for which there is no other adequate remedy in a court." *Id.* § 704. No statute subjects the EVD decision to review; the Immigration and Nationality Act does not even contain the words "Extended Voluntary Departure." Moreover, the denial of EVD is not a final agency action. While the Attorney General's decision not to grant EVD to Salvadoran nationals as a group has been implemented and is ripe for review, his denial of EVD as to any individual is not yet a final agency action; the Attorney General may confer the status at any time prior to actual deportation. Even assuming that the Attorney General has rendered his final decision, Salvadorans still have an adequate remedy before deportation. Once an alien has exhausted administrative remedies in deportation proceedings, he may appeal to the Board of Immigration Appeals and thereafter to the courts of appeal. 8 U.S.C. § 1105a(a); 8 C.F.R. Part 3.

■ Plaintiffs claim that a "humanitarian" standard has controlled the Attorney General's grants of EVD in the past, and that consistent application of this standard requires either a grant of EVD to Salvadorans or an explanation for the alleged departure from previous policy. We cannot agree that the presence of humanitarian concerns in past grants of EVD must control the disposition of this case. The district court correctly held that humanitarian concerns are not, nor could they be, "the sole or overriding factor" in an EVD determination. 594 F.Supp. at 508. In exercising his discretion, the Attorney General may take a number of factors into account; requiring him to grant EVD whenever humanitarian concerns are present would impermissably curtail the exercise of that discretion.

■ Finally, plaintiffs maintain that the Attorney General has acted arbitrarily, pursuing a wavering policy in granting discretionary relief available under a statute. They seek an order compelling him to consider granting EVD status to Salvadorans, on an individual basis, because he has granted EVD to nationals of other countries in the past. We think such a judicial order would be inappropriate. We agree that an agency may not arbitrarily grant or withhold statutorily created and defined remedies. *See Sang Seup Shin v. INS,* 750 F.2d 122 (D.C.Cir.1984) (Bureau of Immigration Affairs may not arbitrarily deny motions to reopen deportation proceedings); *cf. Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (agency discharging its statutory mandate must provide reasoned explanation of change in course). An agency's exercise of inherent, extra-statutory discretion, however, is quite another matter. As the district court held, EVD "describes the Attorney General's discretion in determining the circumstances of both foreign and domestic policy which may give rise to a discretionary decision to grant a temporary suspension of deportation proceedings to members of a particular class of illegal aliens." 594 F.Supp. at 505. Where Congress has not seen fit to limit the agency's discretion to suspend enforce-

ment of a statute as to particular groups of aliens, we cannot review facially legitimate exercises of that discretion.

The separate opinion, while ultimately agreeing with our disposition of this issue, pursues a puzzling path. The opinion rests its finding of non-reviewability on the ground that the Attorney General's refusal to grant EVD is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2) (1982), because the court has no meaningful standard against which to judge the agency's exercise of discretion. We agree that there is no meaningful standard in this case, but decline to insulate all decisions concerning EVD from review on the far-reaching theory that they are "committed to agency discretion by law." That position would effectively insulate all EVD decisions, even ones that may be animated by illegal discriminatory animus, from review. Instead, as we have seen, decisions made by the Congress or the President in the area of immigration are subject to a narrow standard of review. *See Fiallo v. Bell*, 430 U.S. 787, 796, 97 S.Ct. 1473, 1480, 52 L.Ed.2d 50 (1977); *Mathews v. Diaz*, 426 U.S. 67, 81–82, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976).

## V. CONCLUSION

Whatever the level of violence and unrest in El Salvador, we nevertheless are obligated to apply the law in assessing plaintiff's challenges to the INS' asylum procedures and to the Attorney General's decision not to grant EVD to Salvadorans. We agree with the district court that EVD is an extra-statutory remedy and that the decision to award or to withhold it for citizens of a particular nation lies squarely within the discretion of the Attorney General. On the record before us, however, we are unable to approve the district court's grant of summary judgment for defendants on the asylum issue. The district court failed to explain its grant in the face of plaintiffs' unrequited requests for further information which they contended would arm them with evidence necessary to raise a genuine issue of fact.

The opinion of the district court granting summary judgment for defendants is therefore

*Affirmed in part, and reversed and remanded in part.*

SILBERMAN, Circuit Judge, concurring in part and dissenting in part:

Federal courts do not possess "unconditioned authority to determine the constitutionality of legislative or executive acts," *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982), but rather must await the existence of a justiciable case or controversy. The allegations raised in the plaintiffs' complaint, in my view, fail to make out a case that a federal court properly may entertain. I would hold that the plaintiff union Local 25 lacks standing to challenge the process by which the INS considers aliens' claims for asylum; that plaintiff Mauro Hernandez' similar challenge is not ripe for judicial review at this juncture; and that the Attorney General's decision not to suspend the regular enforcement of the immigration laws against Salvadoran aliens is unreviewable. I would, therefore, remand the case to the district court with instructions to dismiss the case for lack of jurisdiction.

## I.

The majority decides that a labor union has standing to challenge the adequacy of training of State Department officers and the weight the INS accords State Department advisory opinions in processing asylum claims. Arriving at this far-reaching conclusion, the majority, in my view, exceeds the established limitations on the power of federal courts under Article III of the Constitution. While dutifully reciting the applicable standards governing the doctrine of standing, the majority nonetheless manifestly misapplies those standards. The majority thus fails to keep itself within "the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197,

2204, 45 L.Ed.2d 343 (1975) (citations omitted).

In this case, Local 25 asserts standing both on the basis of its own interests and as representative for its members. *See* Amended Complaint for Declaratory and Injunctive Relief ¶ 2. The first theory relies upon alleged interference with Local 25's organizational activities. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). To establish standing on this basis, the plaintiff must satisfy both constitutional and prudential requirements encompassed by the doctrine of standing. *See, e.g., Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). In this case, although I have profound doubts about whether Local 25 can satisfy the prudential aspects of standing,[1] I think Local 25's challenge to the INS' asylum procedures suffers from a more fundamental infirmity: it does not meet the bedrock constitutional requirement of resting on "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id.* In my view, the absence of any demonstrable link between the injury of which Local 25 complains and the alleged procedural flaws in the political asylum scheme prevents this court from entertaining its claim.

The injury upon which Local 25 would premise its standing is an impairment of its ability to perform its duties as a labor union. Local 25 alleges that many of the hotel and restaurant employees within its jurisdiction are Salvadorans who, apparently, are illegal aliens whose only realistic prospect of lawfully remaining in the United States is political asylum. Because of their precarious status, these employees "do not identify themselves to the union, do not make known their grievances against their employers, and do not become actively involved in union activities." Maj. Op. at 1264. Next, Local 25 alleges that the procedures by which the INS handles asylum claims are unlawful: the INS gives too much weight to the State Department's advisory opinions, which, in turn, are ill-prepared and otherwise arbitrary.

The problem with Local 25's argument, as I see it, is that there is no recognizable line of causation between the injury it claims and the putative law violations it seeks to redress. The INS' administration of the immigration laws *as a whole* could have at best an indirect effect upon Local 25's relations with its members. When what is at stake is a particularized attack upon a single aspect of those laws—*i.e.*, a challenge to the procedures used in considering claims for political asylum—then it is apparent that that effect is truly diaphanous. Even assuming *arguendo* that the insecurity which Local 25's Salvadoran members experience palpably undermines the union's activities,[2] it cannot be conclud-

---

**1.** The prudential aspects of standing include the requirement that a plaintiff's claim fall within the zone of interests protected by the law he invokes. *See Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). I cannot believe that labor unions were intended beneficiaries of the Refugee Act of 1980. That statute quite clearly was meant to protect the interests of foreign nationals suffering political persecution in their homelands; as such, it represents an *exception* to the general thrust of the immigration laws, which are intended in large part "to preserve jobs for American workers." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 893, 104 S.Ct. 2803, 2809, 81 L.Ed.2d 732 (1984). In fact, this circuit has held that a labor union's economic interest in preventing foreign workers from entering the country places it within the zone of interests protected by a provision of the immigration laws. *See International Union of Bricklayers v. Meese*, 761 F.2d 798, 804–05 (D.C.

Cir.1985). It would be odd, to say the least, if labor unions fell *both* within the zone of interests protected by immigration laws limiting the entry of foreign workers and within the zone of interests protected by the political asylum exception to those laws.

In response to this objection, the majority tells us simply that the union seeks protection of an "organizational interest" in seeing that its members obtain "lawful and secure entry status," and that the Refugee Act "protect[s] this same interest in secure entry status." Maj.Op. at 1263. Absent from this tautology is any demonstration that Congress recognized and sought to protect the union's "organizational interest" in the proper administration of the immigration laws.

**2.** It is not at all clear to me that insecurity among employees will tend to undermine a la-

ed that that insecurity is attributable to the procedural irregularities that allegedly mark the political asylum system.

The statutory standards governing the grant of political asylum are particularly difficult to satisfy. To become eligible for asylum, applicants bear the burden of proving "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (1982). They must demonstrate an individualized threat of harm awaiting them if they are deported; proof of general unrest or repression in their homeland is insufficient. *See Sanchez v. INS*, 707 F.2d 1523, 1526–28 (D.C.Cir.1983). Even those who satisfy this exacting standard may be denied asylum in the discretion of the agency. *See* 8 U.S.C. § 1158(a) (1982); 8 C.F.R. § 208.8(a) (1986).[3] Traditionally, only a small percentage of applicants has been granted asylum. Without a change in these onerous substantive standards, then, modification of INS *procedures* would not be likely to make any particular applicant confident about his prospects for remaining lawfully in the United States. Uncertainty inheres in the asylum process: an applicant may not in fact have a sufficiently "well-founded fear of persecution"; or may lack the evidence to prove it; or may be denied asylum on discretionary grounds. It follows that in

matters respecting political asylum applications, as in most of an illegal alien's affairs, insecurity is inevitable. The fear and uncertainty which Local 25's Salvadoran members experience is more likely to represent the undifferentiated angst of illegal aliens than a discrete harm "fairly traceable" to the INS' allegedly improper procedures. Therefore "unadorned speculation," *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 44, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976), is needed to reach the conclusion that granting Local 25 the relief it seeks—however the decree might be framed—would remove the insecurity of its alien members which allegedly undermines its organizational activities. In short, "the presence of an independent variable between ... the harm and the [putatively illegal] conduct makes causation sufficiently tenuous that standing should be denied." *Mideast Systems v. Hodel*, 792 F.2d 1172, 1178 (D.C.Cir.1986). *See also Allen v. Wright*, 468 U.S. at 757–58, 104 S.Ct. at 3328–29.[4]

Perhaps because Local 25 cannot persuasively establish injury to itself, it also relies upon the theory of "representative standing" recognized in *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). This doctrine permits voluntary associations to sue on behalf of their mem-

bor union's activities. Since a principal function of unions is to assuage the fears and concerns of their members, traditionally unions have achieved their greatest influence among employees in troubled times.

The majority objects that I am not heeding the rule that factual allegations concerning standing must be taken as true for purposes of a motion to dismiss. *See* Maj.Op. at 1263. (citing *Warth v. Seldin*, 422 U.S. at 501, 95 S.Ct. at 2206). But it is also true that "pleadings must be something more than an ingenious academic exercise in the conceivable." *Id.* at 509, 95 S.Ct. at 2210 (citation omitted). Far from contenting itself with uncritically accepting the plaintiffs' allegations, moreover, the majority embellishes those allegations with the assertion that Local 25's Salvadoran members are subject to "employer pressure to remain silent or else be reported for deportation...." Maj.Op. at 1262. This suggestion is creative but is not alleged in the plain-

tiff's complaint and does not appear in the record.

3. I do not mean to suggest, however, that exercises of this discretion would be unreviewable.

4. That the causal link between the asserted injury and the putative law violation is tenuous suggests that Local 25's suit is motivated more by sympathy for its members than by defense of its own interests. Though this sympathy may be understandable, it is clear that "Article III requires more than a desire to vindicate value interests." *Diamond v. Charles*, —— U.S. ——, 106 S.Ct. 1697, 1706, 90 L.Ed.2d 48 (1986) (citation omitted); *cf. Allen v. Wright*, 468 U.S. at 754, 104 S.Ct. at 3326. ("[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court.").

bers in certain circumstances. Under *Hunt*, an organization has standing to sue on behalf of its members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 333, 97 S.Ct. 2434; *see also International Union, UAW v. Brock*, —— U.S. ——, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986). While it is not precisely clear which of these requirements are constitutional and which are prudential, this court, of course, has no authority to disregard *any* of them. And contrary to the majority, I believe that these criteria are not satisfied by the allegations in Local 25's complaint. Putting aside any question about the last of these requirements,[5] I am convinced both that Local 25's members would not now have standing to sue in their individual capacities and that the interests sought to be protected by this lawsuit are not germane to Local 25's organizational purpose.

Local 25's complaint does not allege that its members have in fact applied for political asylum, and the record discloses only a single member who has done so.[6] I think it plain that Local 25's members cannot claim to have been unfairly treated—and concretely harmed—by the government until they actually have applied for and have been denied asylum. This proposition is all the more compelling in a case like this one involving a *procedural* claim. The majority does not explain how individuals can be injured by procedural infirmities in a regulatory scheme that they have not yet invoked. The injury alleged, it would seem, is contingent: *if* Local 25's members apply for asylum, it is asserted, *then* their applications will not be given their due. Neither such conjectural injury, nor the psychic harm one experiences in anticipating that the government will not respond lawfully when one ultimately chooses to call upon it, is cognizable under Article III. *See Local 37, International Longshoremen's Union v. Boyd*, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954) (alien workers cannot challenge INS' policies respecting their admission to the country in advance of seeking such admission); *see also Allen v. Wright*, 468 U.S. at 746, 755, 104 S.Ct. at 3322 (parents cannot challenge tax status of discriminatory private schools in which they have not sought to have their children enrolled); *Warth v. Seldin*, 422 U.S. at 516, 95 S.Ct. at 2214 (builders cannot challenge zoning policies of municipality in which they have not sought to build any projects); *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) (individuals cannot challenge procedures of criminal justice system when they cannot establish any likelihood that they will be subjected to those procedures); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166–67, 92 S.Ct. 1965, 1968, 32 L.Ed.2d 627 (1972) (individual cannot challenge private club's membership policies when he has never applied for membership).

---

5. Doubtless it might be thought that examination of individual asylum applications is indispensable to any evaluation of the fairness of political asylum procedures; due process, after all, is an individual right, not a group right.

6. Examination of the language of the *Hunt* test itself—rather than dictum from another case—belies the proposition announced by the majority, *i.e.*, that Local 25 may possess standing to sue on behalf of its members if a single one of its thousands of members would currently have standing to sue individually. Such a rule blatantly disregards the concerns about autonomy and adequacy of representation that underlie

the *Hunt* test. As Justice Powell cautioned in *International Union, UAW v. Brock*, —— U.S. ——, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) (Powell, J., dissenting op. at 106 S.Ct. 2536–37), "[t]he number of members in the organization with a concrete stake in the outcome ... may be so small that th[e] theoretical identity [between an organization and its members] disappears." In concluding that a union had representative standing in *UAW*, the Court noted that "many" union members had standing to sue in their own right, *see id.*, 2530, and certainly did not authorize the fundamentally unsound rule adopted by the majority in this case.

I must also part company with the majority on the question of whether the rights Local 25 seeks to vindicate through this lawsuit are germane to its organizational purpose. The majority deems it sufficient that Local 25 has alleged that the operation of the immigration laws interferes with its union activities. *See* Maj.Op. at 1264. But the same could be said of the enforcement of *any* laws against a union's members. For example, a union could allege that narcotics prosecutions against its members impaired its organizational activities, and seek to challenge the governmental action at issue on that basis. I cannot believe that the Supreme Court in *Hunt* intended to authorize such dubious proxy litigation. That the Court did *not* so intend is precisely why it insisted that the interests an organization asserts in a lawsuit must be "germane" to its official purpose, *i.e.*, that the rights sought to be vindicated are the sort of rights that by their *nature* relate to a particular organization.[7]

In this regard, certain types of laws inherently relate to a union's traditional functions. In *UAW*, for instance, the Supreme Court recognized a union's interest in seeing that its members received statutory benefits available to workers displaced by foreign competition. *See* 106 S.Ct. at 2531. *See also National Treasury Employees Union v. MSPB*, 743 F.2d 895, 910 (D.C. Cir.1984) (public employment regulations are germane to union representing affected employees). I do not mean to suggest that unions may *never* have standing to represent interests of their members that do not relate to a union's traditional functions. Where, for example, Congress has recognized the legitimacy of union participation in a statutory scheme, courts would have little basis for questioning the "germaneness" of the statutorily created interests to the union's purpose. *See UAW*, 106 S.Ct. 2531 (noting that Congress gave unions a role in statute's administration). In the absence of such congressional recognition, however, I do not believe that a union may infinitely expand the interests "germane" to its organizational purpose simply by expressing its concern, in its constitution or elsewhere, about the operation of particular laws. To be sure, the duties and functions of a labor union vis-a-vis its members may be broad indeed, and courts should normally be circumspect in determining the appropriate scope of a union's representation of its members. But Article III courts are not available to *anyone* wishing to litigate any grievances, and, I submit, the claims of aliens for procedural regularity in the political asylum process, under any reasonable view, simply do not implicate the functions of a union *qua* union. I therefore would conclude that Local 25 lacks standing to challenge the procedures by which the INS considers political asylum applications.[8]

---

7. This is perhaps just another way of saying that the organization must be within the zone of interests protected by the law it invokes. *See supra* note 1.

8. The majority takes me to task for failing to discuss the bearing upon the union's standing of its separate challenge to the Attorney General's decision not to suspend the regular operation of the immigration laws against Salvadorans. *See* Maj.Op. at 1263–65. I should have thought it settled that standing must be analyzed on a claim-by-claim basis. *See Allen v. Wright*, 468 U.S. at 752, 104 S.Ct. at 3325 (courts must "ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted"); *Diamond v. Charles*, 106 S.Ct. at 1707 (Article III standing "requires an injury with a nexus to the substantive character of the statute or regulation at issue"). In this regard, the interests implicated by the Attorney General's decision not to suspend enforcement of the immigration laws are, under *Hunt*, no more germane to the union's purpose than are those implicated by the procedures governing political asylum. Nor does the decision to enforce the immigration laws cause Local 25 itself any injury redressable by a court: because a suspension of enforcement would not alter illegal aliens' legal status, would be temporary, and would be reversable at the will of the Attorney General, it would not by itself render Local 25's members "secure" enough to participate in union activities. In any event, the decision to enforce the immigration laws is unreviewable. *See infra* Part III.

## II.

Plaintiff Mauro Hernandez's challenge to the INS' political asylum procedures obviously rests on somewhat sturdier ground than does Local 25's. Hernandez has applied for asylum to an INS district director and has been rejected. If the procedures involved in that determination were unlawful, then Hernandez has suffered cognizable injury to a personal interest; moreover, as an applicant for political asylum, Hernandez is within the zone of interests protected by the Refugee Act. *See supra* note 1. I therefore agree with the majority that Hernandez has standing to challenge the procedures used in processing his asylum application.[9] To say that Hernandez has standing, however, is not to say that a court must immediately hear his claim. I would conclude that because the political asylum scheme contemplates further administrative procedures before the denial of asylum is finalized, and because Hernandez will not be irrevocably injured if review is postponed, Hernandez's claim is not yet ripe for judicial review.[10]

Although the criteria governing the ripeness doctrine are familiar, they have not—as may be evident from my disagreement with the majority—proven themselves susceptible to precise application. The test for ripeness enunciated in *Abbott Laboratories*

*v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), which requires courts to evaluate the fitness of the issues for judicial decision and the hardship to the parties of deferring review, *id.* at 149, 87 S.Ct. at 1515, cannot be applied with syllogistic certainty. Rather, the test entails "a prudential attempt to time review in a way that balances the petitioner's interest in prompt consideration of allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Eagle-Picher Indus. v. EPA,* 759 F.2d 905, 915 (D.C.Cir.1985) (footnote omitted). It would be idle, moreover, to attempt to explicate all of the approaches to this balancing inquiry reflected in decisions of this circuit as if they formed a finely meshed doctrine. That much being conceded, however, I must say that I have little difficulty in concluding that Hernandez's challenge is not ripe. It seems to me that *all* of the relevant interests to be balanced in this case point in the direction of deferring judicial review.

Although Hernandez's application for asylum was rejected by an INS district director, that determination is hardly decisive. Hernandez may not be deported unless and until the government establishes

9. Because the Attorney General's decision to continue enforcing the immigration laws against Salvadorans is unreviewable, *see infra* Part III, it is unnecessary to decide whether Hernandez has standing to challenge that determination as well.

10. So that there is no misunderstanding, I should emphasize that I consider Hernandez's claim to be "ripe" in the constitutional, case-or-controversy sense. Hernandez has alleged actual, non-speculative injury to himself sufficient to give rise to a constitutionally ripe controversy. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 81, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978); *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 138, 143, 95 S.Ct. 335, 355, 358, 42 L.Ed.2d 320 (1974). In this regard, the constitutional requirements of standing and ripeness overlap, *cf. Vander Jagt v.*

*O'Neill,* 699 F.2d 1166, 1178–79 (D.C.Cir.) (Bork, J., concurring), *cert. denied,* 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983), and satisfaction of the latter follows *a fortiori* from satisfaction of the former. *See Duke Power,* 438 U.S. at 81, 98 S.Ct. at 2634. My concerns lie instead with the purely prudential requirements of ripeness—*i.e.,* with the doctrine, developed by courts of equity, that governs the appropriate timing of judicial review of challenged administrative action. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). That doctrine typically requires not only that a party allege injury, but that the injury be of the sort that will be *irremediable* if judicial review is postponed. *See Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 164–65, 87 S.Ct. 1520, 1524–25, 18 L.Ed.2d 697 (1967).

his deportability through an adversary process subject to ultimate judicial review. *See* 8 U.S.C. § 1252(b) (1982); 8 C.F.R. Part 242 (1986). If the government initiates deportation proceedings against him, Hernandez will have the opportunity to reapply for asylum to an immigration judge, *see id.* § 208.9, and the question will be considered afresh. A denial of asylum at that point would be appealable to the Board of Immigration Appeals, *see id.* § 3.1(b)(2), and thereafter to the United States Court of Appeals. *See* 8 U.S.C. § 1105a (1982). The agency's initial rejection of Hernandez's bid for asylum, thus, in no respect constitutes its final or definitive decision on the matter. Under these circumstances, the agency has a strong interest in deferring judicial review: the agency's resources will be engaged only if it chooses to initiate deportation proceedings against Hernandez, and the agency will have an opportunity to correct any mistakes it has made, free from unwarranted judicial interference. *See Continental Air Lines v. CAB*, 522 F.2d 107, 125 (D.C.Cir.1974) (en banc).

Examination of the character of the district director's role in the asylum process buttresses this conclusion. The procedure by which the district director entertains applications for asylum is, in essence, a form of pre-enforcement administrative screening. Both the agency and the applicant benefit from a procedure that permits asylum applications to be considered in advance of the commencement of deportation proceedings: the agency reduces the number of deportation proceedings it must initiate, and the applicant gets an early word on his bid for asylum. But nothing in the Act *requires* such advance review; the Act vests broad discretion in the Attorney General to establish the procedural framework governing asylum claims. *See* 8 U.S.C.

§ 1158(a) (1982). In providing for consideration of asylum applications by the district director, the agency did not contemplate that courts would intervene at this preliminary stage. *See* 8 C.F.R. § 208.8(c) (1986). The majority nevertheless maintains that Hernandez's challenge may be heard now because systemwide, "structural" illegalities are alleged. *See* Maj.Op. at 1267. What the majority ignores is the incentive its decision creates for the government to do away with advance screening of applications *altogether*. Faced with the prospect of intrusive judicial oversight of its preliminary decisional processes, the Executive Branch may conclude that pre-enforcement screening is simply not worth the candle.

In any event, because the agency's disposition of Hernandez's application may be modified, this court also has a significant interest in deferring review. *Continental Air Lines*, 522 F.2d at 125. An about-face by the agency would render judicial review of Hernandez's claim unnecessary. It would also enable the court to avoid reaching the difficult constitutional issues raised in this lawsuit. Review of Hernandez's claim at this time, then, might well be a gratuitous venture entailing the risk of an improvident pronouncement on the law.[11] These are precisely the prudential considerations with which the ripeness doctrine is concerned. *See Abbott Laboratories*, 387 U.S. at 148, 87 S.Ct. at 1515 (doctrine serves to "prevent the courts ... from entangling themselves in abstract disagreements over administrative policies"). The claim Hernandez seeks to raise is thus "unfit" for judicial review at this time.

In addition, Hernandez will suffer no irreversible hardship if review is delayed. Although the INS district director "injured" Hernandez by rejecting his application for asylum, that injury is not irrev-

---

11. The majority seems to doubt that a grant of political asylum to Hernandez will moot his challenge to the procedures used by the INS in considering his application. *See* Maj.Op. at 1267. If Hernandez receives political asylum, I

cannot imagine what effect his lawsuit—which seeks only prospective relief—possibly could have, save "the refinement of jurisprudential understanding." *Valley Forge Christian College*, 454 U.S. at 473, 102 S.Ct. at 759.

ocable. Should the government initiate deportation proceedings against Hernandez, he will have a second bite at the asylum apple. Until that time, Hernandez labors under no injury for which there is no ultimate remedy. The majority apparently finds the requisite "hardship" in the uncertainty to which an illegal alien is subject. *See* Maj.Op. at 1267. An interest in establishing certainty in one's legal relations, however, accompanies *every* putative challenge to administrative action, and, without more, has not traditionally been thought sufficient to enable one to call upon the courts prior to the availability of authorized routes of review. *See, e.g., Tennessee Gas Pipeline Co. v. FERC,* 736 F.2d 747, 750–51 (D.C.Cir.1984). Since "no irremediable adverse consequences flow from requiring a later challenge to this [decision]," *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967), I would hold that Hernandez's challenge to the INS' preliminary asylum determination is not ripe for review.

### III.

I agree with the majority that the Attorney General's decision not to suspend the regular operation of the immigration laws against Salvadoran nationals (the so-called grant of "extended voluntary departure") is not judicially reviewable. *See* Maj.Op. at 1272. I would rest this conclusion, however, squarely on the ground that the action is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2) (1982).

The decision to withhold enforcement of the immigration laws is extrastatutory; it constitutes one of the Executive's inherent prerogatives. The Constitution entrusts to the President the duty to "take Care that the Laws be faithfully executed...." U.S. Const. art. II, § 3. It has long been settled that "the Executive Branch has exclusive

authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon,* 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974) (citations omitted). The decision whether or not to enforce the immigration laws against particular nationalities, moreover, is an exercise of "the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950). The Executive Branch is therefore free to take into account whatever considerations it deems in the national interest. Such action is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2) (1982), because "a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). To be sure, *Chaney* involved an agency's refusal to initiate enforcement action, while this case involves the refusal to *suspend* enforcement. Review of either decision, however, would enmesh a court in matters that are beyond judicial competence and that properly belong within the sphere of the Executive. The Attorney General's decision to continue enforcing the immigration laws against Salvadorans plainly is not reviewable under the Administrative Procedure Act. The majority, although taking a somewhat different path, ultimately reaches the same destination.